## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND | ) ) ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| v. | ) | 1:06-cv-2010 (RMC) |
| | ) | |
| SUPERIOR INTERIORS INC., a/k/a Superior Interior, *et al.* | ) ) ) | |
| Defendants. | ) | |

## MOTION FOR ENTRY OF DEFAULT JUDGMENT

Plaintiff, the International Painters and Allied Trades Union Industry Pension Fund

("Pension Fund" or "Plaintiff"), respectfully moves this Court for entry of judgment by default

against Defendants, Superior Interiors Inc., a/k/a Superior Interior ("Company") and Frank

LaTeano ("Individual Defendant" and together with Company, "Defendants"), jointly and

severally, in the amount of $255,513.51, which includes contributions, interest, liquidated

damages and attorneys' fees and costs incurred by the Pension Fund pursuant to 29 U.S.C.

§185(a) and 1132(g)(2)(A) through (D), and for injunctive relief.

In support of this Motion, Plaintiff relies upon the allegations in its Complaint, the

Declaration of Thomas Montemore[1] and the Declaration of Sanford G. Rosenthal.[2]

The grounds for this Motion are as follows:

1.      Prior to the commencement of this action, the Plaintiff attempted to resolve this

delinquency in an amicable manner.

---

[1]      The Declaration of Thomas Montemore ("Montemore Declaration") is attached to this Motion as Exhibit 1. The exhibits referenced in the Montemore Declaration are attached as Exhibits 2-4.

[2]      The Declaration of Sanford G. Rosenthal ("Rosenthal Declaration") is attached to this Motion as Exhibit 5. The exhibit referenced in the Rosenthal Declaration is attached to this Motion as Exhibit 6.

179771-1

2.     The requested payments were not received and the Complaint in this matter was filed on November 27, 2006.  The Complaint was served on Frank LaTeano and Company on December 22, 2006 as appears from the Affidavits of Service duly filed with the Court.

3.     No Answer to the Complaint has been filed by the Defendants.

4.     On January 22, 2007, Plaintiff filed a Request to Clerk to Enter Default against the Defendants pursuant to Fed. R Civ. P. 55(a). A copy was sent via first-class mail, postage prepaid, to the Defendants.

5.     On January 23, 2007, the Clerk of the Court entered default against all Defendants.

6.     Defendants are neither infants nor incompetent people and the Individual Defendant is not in the military service.

**WHEREFORE**, Plaintiff seeks the following relief:

(a)     Judgment entered as set forth in the proposed Order and Judgment attached to this Motion; Such other and further relief as the Court deems just, necessary and appropriate.

Respectfully submitted,

JENNINGS SIGMOND, P.C.
 /s/ Sanford G. Rosenthal
SANFORD G. ROSENTHAL
Bar No. 478737
KENT CPREK
Bar No. 478231
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683
(215) 351-0611/0660
Attorneys for the Fund

Date: February 15, 2007
OF COUNSEL:
ELIZABETH A. COLEMAN
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683
(215) 351-0644
179771-1

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL PAINTERS AND ALLIED )
TRADES INDUSTRY PENSION FUND )
)
                    Plaintiff, )      CIVIL ACTION NO.
     v. )      1:06-cv-2010 (RMC)
)
SUPERIOR INTERIORS INC., )
   a/k/a Superior Interior, *et al.* )
)
               Defendants. )

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
JUDGMENT BY DEFAULT PURSUANT TO FEDERAL RULE OF
CIVIL PROCEDURE 55(b) AGAINST DEFENDANTS.**

      Plaintiff, the International Painters and Allied Trades Union Industry Pension Fund

("Pension Fund" or "Plaintiff"), by its legal counsel, submits this Memorandum of Law in

Support of its Motion for Judgment by Default.[1]

      The Plaintiff served its Complaint on Defendants, Superior Interiors Inc., a/k/a Superior

Interior ("Company") and Frank LaTeano ("Individual Defendant" and together with Company,

"Defendants"), on December 22, 2006.  To date, Defendants have failed to answer the Complaint

or otherwise defend this action. On January 22, 2007, Plaintiff filed a Request For Entry of

Default against Defendants pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. The

default was entered against all defendants on or about January 23, 2007.

      In light of Defendants' default and Defendants' continuing failure to appear or otherwise

defend, the Pension Fund is entitled to judgment by default against Defendants without a

hearing. Fed. R. Civ. P. 55(b); United States v. De Frantz, 708 F. 2d 310 (7th Cir. 1983);

---

[1]     Attached to the Motion accompanying this Memorandum are the Declarations of Thomas Montemore
("Montemore Declaration") and Sanford G. Rosenthal ("Rosenthal Declaration"). Also attached is a proposed form
of Default Judgment.

Draisner v. Liss Realty, 211 F. 2d 808 (1954). Moreover, where defendants, such as those here, fail to respond to the Complaint, all factual allegations in the Complaint are deemed admitted. Thomson v. Wooster, 114 U.S. 104 (1885); Au Bon Pain Corp. v. Artect, Inc., 653 F 2d 61 (2d Cir. 1981); U.S. ex. Rel. v. Carr, 567 F. Supp. 831, 840 (W.D. MI 1983). General allegations of fact are also deemed true. Danning v. Lavin, 572 F. 2d 1386, 1388-89 (9th Cir. 1978) (allegations of insolvency pled in general terms held sufficient to support a finding of fraudulent conveyance or voidable preference).

Defendants were and have been party to collective bargaining agreements (singly or jointly "Labor Contract") with the various local unions and district councils affiliated with the International Union of Painters and Allied Trades, AFL-CIO-CFC ("International" or "Union"). See, Exhibit 1, Montemore Declaration, ¶6; Exhibit 2, a true and correct copy of relevant provisions from the Labor Contract. Under the Labor Contract, Defendants are required to remit fringe benefit contributions and other sums to Plaintiff. See, Exhibit 1, Montemore Declaration, ¶¶6-7; Exhibit 2, Labor Contract, at Art. XV. The failure to pay these fringe benefit contributions and other amounts results in a delinquency to the Plaintiff.

In addition, prior to the commencement of this lawsuit the Pension Fund and the Defendants entered into two settlement agreements in efforts to collect amounts owed to the Pension Fund by Defendants. The first agreement was entered in September 2005 and the second agreement was entered in April 2006.[2]   Pursuant to the terms of the April 18, 2006

---

[2]   This is not the first time Company has become delinquent to the Pension Fund. On September 20, 2005 the Pension Fund and Defendants reached a settlement for delinquent contributions. The September 20, 2005 settlement included a Promissory Note and Personal Guarantee executed by Defendants. True and correct copies of the September 20, 2005 settlement documents are attached as Exhibit 4. Company defaulted on the September 20, 2005 Promissory Note.
    The parties agreed to enter into a second settlement agreement with an installment payment plan to repay the remaining amounts due along with accrued interest. The second settlement was reached April 18, 2006 and executed by Defendants on April 25, 2006. This settlement included a Promissory Note and Personal Guarantee

Promissory Note ("April 2006 Note") and Personal Guarantee ("April 2006 Guarantee")

executed on April 25, 2006, by Individual Defendant, the Pension Fund settled the delinquencies

and was to receive payments totaling $79,631.50.  Defendants defaulted on the April 2006 Note

as a result of failing to pay the monthly installments and current contributions.  True and correct

copies of the April 2006 Note and Guarantee are attached as Exhibit 3.

## ARGUMENT

A.    **ENTRY OF JUDGMENT AGAINST DEFENDANTS, JOINTLY AND SEVERALLY, FOR UNPAID CONTRIBUTIONS, INTEREST, LIQUIDATED DAMAGES AND ATTORNEYS' FEES AND COSTS IS ENTIRELY APPROPRIATE**

Defendants are parties to a Labor Contract with the Union. See, Exhibit 1, Montemore

Declaration, ¶6; Exhibit 2, Labor Contract. The Labor Contract provides for the payment of

contributions to the Pension Fund for time worked by or paid to employees who perform work

covered by its terms and conditions. See, Exhibit 1, Montemore Declaration, ¶7; Exhibit 2, Labor

Contract, at Art. XV. Failure to make these contributions, or to submit either incorrect or late

remittance reports, results in a delinquency to the Pension Fund. Ibid. Under the Labor Contract,

the Pension Fund also has the right to audit the signatory's payroll books and related records to

determine that all of the required contributions have been paid. See, Exhibit 1, Montemore

Declaration, ¶¶6,12; Complaint, Exh. 1; Exh.2, Labor Contract, at Art. XV.  Finally, under the

terms of the Labor Contract, the employer agrees to be bound by the Agreement and Declaration

of Trust of the Pension Fund ("Trust Agreement," attached as Exhibit 1 to the Complaint filed in

this matter and incorporated by reference) and the International Painters and Allied Trades

Industry Pension Plan ("Plan," attached as Exhibit 2 to the Complaint filed in this matter and

---

executed by Frank LaTeano.  A true and correct copy of the April 18, 2006 settlement documents is attached as Exhibit 3.

incorporated by reference) and by all amendments thereto and actions taken by the trustees of the Pension Fund. See, Complaint, ¶¶ 7-9; Exhibit 1, Montemore Declaration, ¶6; Exhibit 2, Labor Contract, at Art. XV.

Furthermore, Section 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1145, provides:

> Every Employer who is obligated to make contributions to a bargained agreement shall … make contributions in accordance with … such agreement.

If an employer fails to make the contributions as required by the collective bargaining agreement and Section 515 of ERISA, then the employer is subject to the provisions of Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2). Section 502(g)(2) provides for the mandatory award of the following if a judgment is entered in the Pension Fund's favor pursuant to Section 515:

A.    the unpaid contributions;

B.    interest on the unpaid contributions;[3]

C.    an amount equal to the greater of:

    (i)    interest on the unpaid contributions; or

    (ii)    liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the Court under subparagraph (a);[4]

---

[3]    Section 10.12(b)(2) of the Plan sets the interest rate on delinquent contributions according to the Internal Revenue Service rate for delinquent taxes. See, Complaint, Exhibit 2.

[4]    ERISA and §10.12(b)(3) of the Plan's rules and regulations mandate that liquidated damages be awarded in an amount equal to the greater of interest or twenty percent (20%) of unpaid contributions due at the commencement of the lawsuit and those which become delinquent during the course of the litigation. See, Complaint, Exhibit 2. Article VI, Sec. 4 of the Trust Agreement also provides for the assessment of liquidated damages on contributions paid after the due date. See, Complaint, Exhibit 1.

      D.      reasonable attorneys' fees and costs of the action, to be paid by the Defendants; and

      E.      such other legal or equitable relief as the court deems appropriate.

Company has defaulted on the Agreement and failed to submit contributions for the period July 2006 through August 2006 and has failed to submit contributions and remittance reports for the period September 2006 through December 2006. See, Exhibit 1, Montemore Declaration, ¶9. As a result, Plaintiff is entitled to judgment in at least the amount of $255,513.51.

## 1.      Defendants owe contributions in at least the amount of $203,436.50

The remaining principal balance on the defaulted April 18, 2006 Note is $55,459.10. Defendants have failed to submit the required contributions for the period of July 2006 through August 2006 in the total amount of $46,922.88. See Exhibit 1, Montemore Declaration, ¶8. Defendants have also failed to submit contributions for the period September 2006 through December 2006 in the estimated amount of $101,054.52. See Exhibit 1, Montemore Declaration, ¶9. This amount is estimated because the Defendants have failed to submit the contractually-required remittance reports. The estimated contributions are calculated by the Pension Fund based on the average of the last three months of remittance reports filed by Company. See, Exhibit 1, Montemore Declaration, ¶10. Therefore, Defendants owe a total of at least $203,436.50 in contributions.

## 2.      Defendants owe interest in the amount of $7,698.20

The rules and regulations as set forth in §10.12(b)(2) of the Plan set the interest rate on delinquent contributions according to the Internal Revenue Service rate for delinquent taxes. Interest accruing through February15, 2007 on Defendants' delinquent contributions totals $7,698.20 ($4,443.59 on the defaulted April 18, 2006 Note, and $3,254.61 on unpaid

contributions for the period July 2006 through December 2006). See, Exhibit 1, Montemore

Declaration, ¶10; 29 U.S.C. §1132(g)(2)(B); 26 U.S.C. §6621. Interest will continue to accrue

until the amounts are paid.

3.    **Defendants owe liquidated damages in the amount of $40,687.31**

ERISA and §10.12(b)(3) of the Plan's rules and regulations mandate that liquidated

damages be awarded in an amount equal to the greater of interest or twenty percent (20%) of

unpaid contributions due at the commencement of the lawsuit and those which become

delinquent during the course of the litigation. Article VI, Sec. 4 of the Pension Fund's Trust

Agreement also provides for the assessment of liquidated damages on contributions paid after the

due date. The total amount of liquidated damages is $40,687.31. The amount of liquidated

damages is greater than the interest due ($7,698.20). Therefore, Defendants owes $40,687.31 in

liquidated damages. See, Exhibit 1, Montemore Declaration, ¶11; 29 U.S.C. §1132(g)(2)(C).

4.    **Defendants owe attorneys' fees in the amount of $3,691.50**

Plaintiff has incurred $3,691.50 in attorneys' fees and costs in connection with this matter

through February 13, 2007. See, Exhibit 5, Rosenthal Declaration, ¶2; Exhibit 6. See, 29 U.S.C.

§1132(g)(2). The Pension Fund is entitled to reimbursement of all attorneys' fees and costs it

incurs in connection with the enforcement and collection of any judgment entered by the Court.

See, International Painters and Allied Trades Industry Pension Fund v. H.W. Ellis Painting Co.,

Inc., No. 03-1125, slip. op. at *3 (D.D.C. February 10, 2004) (citing Free v. Briody, 793 F.2d

807 (7th Cir. 1986); Trucking Employees of North Jersey Welfare Fund, Inc. v. Bellezza Co., 57

Fed. Appx. 972 (3d Cir. 2003); Sheet Metal Workers Health and Welfare Trust Fund v. Big D

Service Co., 867 F.2d 852 (10th Cir. 1989)). Therefore, Defendants owe $3,691.50 in attorneys'

fees and costs.

5.    **The Pension Fund is entitled to injunctive relief**

The failure of Defendants to comply with their contractual and statutory obligations results in a substantial adverse impact on the Pension Fund's ability to meet its legal obligations. The Pension Fund is obligated by express mandates of ERISA and by the documents and instruments by which it is administered to provide benefits and pension credits to all of Company's employees who are otherwise eligible to receive them. 29 C.F.R. 2530-200b-2(a)(1) and (2); Central States, S.E. & S.W. Areas Pension Fund v. Admiral Merchants Motor Freight, Inc., 511 F.Supp. 38 (D.Minn. 1980), aff'd sub. nom., Central States, S.E. & S.W. Areas Pension Fund v. Jack Cole-Dixie Highway Co., Inc., 642 F.2d 1122 (8th Cir. 1981). The Pension Fund is required to provide these benefits and credits regardless of whether Defendants make the contributions. For example, if employees perform work covered by the collective bargaining agreement, the Pension Fund has affirmative obligations to credit hours for retirement benefits regardless of whether a signatory employer makes contributions to the Pension Fund. The result of Company's non-compliance with ERISA and the Labor Contract is a significant drain on the Pension Fund's resources.

Additionally, where, as here, Defendants fail to remit their contributions, the Pension Fund loses the income that it would have earned by investing those contributions. Combining this loss of investment income with the Pension Fund's requirement to continue paying benefits to Company's employees (as well as to the employees of other signatory contractors) will eventually affect the actuarial soundness of the Pension Fund as well as deplete the resources available to pay current pension benefits.

Furthermore, the Pension Fund incurs additional administrative expenses as a result of Defendants' failure to pay their contributions. These losses and added expenses significantly

impair the Pension Fund's ability to continue to provide benefits to not only Company's employees, but also to employees of companies that comply with their contractual obligations.

In light of Defendants' failure to comply with their contractual and statutory obligations to the Pension Fund to submit timely, accurate remittance reports and pension contributions each month, and the irreparable harm which Defendants' malfeasance causes the Pension Fund, the Pension Fund respectfully requests the injunctive relief which is set forth in its proposed default judgment. Laborers' Fringe Benefit Funds v. Northwest Concrete, 640 F.2d 1350, 1352 (6th Cir. 1981); IBPAT Union and Industry Pension Fund v. Hartline-Thomas, Inc. , 4 EBC 1199, 1200 (D.D.C. 1983); Teamsters Local 639 - Employers Trust v. Jones & Artis Construction Co., 640 F.Supp. 223 (D.D.C. 1986).

**B.      COMPANY SHOULD BE ORDERED TO PRODUCE THE APPROPRIATE RECORDS TO ALLOW THE PENSION FUND TO AUDIT ITS PAYROLL BOOKS AND RELATED RECORDS AND DEFENDANTS MUST PAY ANY ADDITIONAL AMOUNTS FOUND TO BE DUE AND OWING**

The determination of an employee's eligibility for benefits is made based upon information contained in the remittance report, to be filed monthly by each and every signatory employer. A proper determination of eligibility is not possible if remittance reports are not submitted or if they contain incorrect information. See, 29 U.S.C. §1132(g)(2)(E) (equitable relief); Teamsters Local 639 – Employers Trust v. Jones & Artis Construction Co., 640 F. Supp.223 (D.D.C. 1986); IBPAT Union and Industry Pension Fund v. Hartline – Thomas, Inc., 4 EBC 1199, 1200 (D.D.C. 1983); Laborers' Fringe Benefit Pension Fund v. Northwest Concrete, 640 F. 2d 1350, 1352 (6th Cir. 1981).

In order to determine whether the contributing employer has made all required contributions and correctly reported hours worked and paid to its employees, the Pension Fund

has the right to review all of the employer's records that relate to its contributory obligation. Central States, S.E. & S.W. Areas Pension Fund v. Central Transport, Inc., 472 U.S. 559, 105 S.Ct. 2833 (1985). The employer has the obligation to maintain appropriate records and to permit the Pension Fund's auditors to review those records upon request. Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc., 30 F.3d 692, 695 (6th Cir. 1994).

In the present case, the Labor Contract and Trust Agreement obligate Defendants to allow the audit. See Exhibit 1, Montemore Declaration, ¶¶6,12; Exhibit 2, Labor Contract, at Art. XV; Complaint, Exhibit 1, Art. VI, Sec. 6. The scope of records subject to review is broad, and include those records the auditors reasonably deem necessary to conduct an audit. DeMarco v. C & L Masonry, 891 F.2d 1236 (6th Cir. 1989). In addition to the routine payroll records (e.g., time cards, cancelled payroll checks, payroll ledgers and payroll tax returns), they can include the general check registers and cancelled checks, general disbursements ledgers and federal and state corporate income tax returns. Ibid.

An audit is necessary in this case in order to determine the exact amount due to the Pension Fund because of Defendants' failure to submit contractually-required remittance reports and furthermore, to ensure that the remittance reports submitted by Defendants are correct. See Exhibit 1, Montemore Declaration, at ¶¶9, 12. The Company's obligations under the Agreement and 29 U.S.C. § 1145 mean nothing if the Pension Fund cannot ensure compliance through an audit. The Court should order Company to produce its records for an audit for all periods in which the Defendants are obligated to make contributions to the Pension Fund so that a precise determination of the amount owed can be made. Upon completion of the audit, the Court should enter a further judgment against Defendants for all additional amounts found to be due and owing under the Agreement and ERISA.

## **CONCLUSION**

Plaintiff, therefore, requests that the Court enter a judgment against Defendants, jointly

and severally, in the amount of $255,513.51, which includes $3,691.50 in attorneys' fees and

costs, order Defendants to submit the remittance reports and corresponding contributions

together with interest and liquidated damages and order Company to produce its payroll books

and related records for an audit for all periods in which the Company is obligated to make fringe

benefit contributions to the Pension Fund.

In light of the clear statutory intent of ERISA, it is respectfully requested that this Court

grant the Pension Fund the relief requested in the Motion for Default Judgment.

<div style="margin-left: 50%">

Respectfully submitted,

JENNINGS SIGMOND, P.C.

 /s/ Sanford G. Rosenthal
SANFORD G. ROSENTHAL
Bar No. 478737
KENT CPREK
Bar No. 478231
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683
(215) 351-0611/0660
Attorneys for the Fund

</div>

Date:February 15, 2007

OF COUNSEL:
ELIZABETH A. COLEMAN
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683
(215) 351-0644

## CERTIFICATE OF SERVICE

I, SANFORD G. ROSENTHAL, ESQUIRE, state, under penalty of perjury, that the

foregoing Motion for Judgment by Default by the Court pursuant to Federal Rule of Civil

Procedure 55(b)(2) against Defendants was served by mailing same first class mail, postage

prepaid, on the date listed below to:

Frank LaTeano
230 Main Street
East Windsor, CT  06088

and

Superior Interiors, Inc. a/k/a Superior Interior
230 Main Street
East Windsor, CT  06088

s/ Sanford G. Rosenthal
SANFORD G. ROSENTHAL, ESQUIRE

Date: February 15, 2007

**THIS DOCUMENT HAS BEEN ELECTRONICALLY FILED AND IS AVAILABLE
FOR VIEWING AND DOWNLOADING FROM THE ECF SYSTEM**

179771-1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND | ) ) ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| v. | ) | 1:06-cv-2010 (RMC) |
| | ) | |
| SUPERIOR INTERIORS INC., a/k/a Superior Interior, *et al.* | ) ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND JUDGMENT BY DEFAULT AGAINST DEFENDANTS

Upon consideration of the Complaint and Plaintiff's Motion for Entry of Judgment by Default, the supporting Memorandum, declarations and attached Exhibits, it appears to the Court that Defendants were served with process and have inexcusably, knowingly and willfully failed to appear, plead or otherwise defend, and the default against said Defendants having been entered, the Court **FINDS:**

A.     Defendants, Superior Interiors Inc., a/k/a Superior Interior ("Company") and Frank LaTeano ("Individual Defendant" and jointly with Company, "Defendants") are bound to a collective bargaining agreement requiring it to remit fringe benefit contributions and other sums to Plaintiff.

B.     Defendants have failed to remit to Plaintiff the fringe benefit contributions and other sums required by the collective bargaining agreement.

C.     Individual Defendant guaranteed all amounts due to the Plaintiff by the Company and since Company is an unincorporated entity; he is personally liable for all amounts due to Plaintiff.

179771-1

Consistent with these findings, it is **ORDERED**:

1.  Plaintiff's Motion is Granted.

2.  Pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure and 29 U.S.C. §1132(g)(2)(A) through (E), judgment is entered in favor of Plaintiff, International Painters and Allied Trades Industry Pension Fund ("Pension Fund" or "Plaintiff"), and against Defendants, jointly and severally, in the amount of $255,513.51, which consists of the following:

> (a)  Unpaid contributions in the amount of $203,436.50, which is comprised of $55,459.10 in remaining principal balance of the April 18, 2006 Note and $147,977.40 due for the period July 2006 through December 2006;

> (b)  Liquidated damages in the amount of $40,687.31;

> (c)  Interest through February 15, 2007 in the amount of $7,698.20. The contribution amount in Paragraph 2(a) shall continue to bear interest as provided in 29 U.S.C. §1132(g)(2)(B) and 26 U.S.C. §6621, as from time to time amended, until the date of actual payment.

> (d)  $3,691.50, representing the attorneys' fees and costs incurred in the collection and enforcement of this action through February 13, 2007, in accordance with 29 U.S.C. §1132(g)(2)(D).

3.  Defendants, their owners, officers, agents, servants, attorneys and all other persons acting on their behalf or in conjunction with them shall be and hereby are restrained and enjoined from refusing to file complete, proper and timely remittance reports with the accompanying contributions and dues for all periods Defendants are obligated to do so under the collective bargaining agreement(s);

179771-1

4.      Within ten (10) days of the entry of this Order, Defendants shall fully and accurately complete and submit to the Plaintiff any and all outstanding remittance reports, including but not limited to reports and contributions for the period July 2006 through December 2006, together with a check for the full amount of the contributions and dues due, including interest and liquidated damages.

5.      Within twenty (20) days of a request by Plaintiff or its counsel, Company shall make available to the designated representative of the Plaintiff all payroll books and related records necessary for Plaintiff to ascertain the precise amount of any delinquent contributions due and owing to Plaintiff for all periods in which Company is obligated to make fringe benefit contributions to the Plaintiff and Defendants shall bear the costs of said audit.

6.      Plaintiff shall have the right to conduct future audits for all relevant periods, including the time periods covered by this judgment. Company shall be and hereby is restrained and enjoined from failing and refusing to submit to such audits by certified public accountants selected by Plaintiff and shall produce all payroll books and related records requested by Plaintiff, including, but not limited to, payroll, wages, general ledger and cash disbursement records, compensation insurance audits and by other pertinent records deemed necessary for the purpose of ascertaining and/or verifying payments and/or liabilities to Plaintiff. Defendants shall pay Plaintiff any additional amounts found owing, plus such other amounts as set forth in the Agreement, the Agreement and Declaration of Trust of the Pension Fund, the International Painters and Allied Trades Industry Pension Plan, ERISA or any other applicable law.

7.      If additional delinquencies are discovered pursuant to the submission of the remittance reports or to the audit referred to above, or as a result of additional information that becomes available to the Plaintiff, the Plaintiff may apply to the Court for an additional or

179771-1

supplemental judgment reflecting any additional delinquencies, interest, liquidated damages,

attorneys' fees and costs, pursuant to ERISA, 29 U.S.C. §1132(g)(2) together with any audit

costs incurred by the Plaintiff.

8.      If any such further action by the Plaintiff is required, it may apply to this Court or

to the court in which enforcement is sought, for such further reasonable attorneys' fees and costs

in addition to those set out in Paragraph 2(d) above. See, Trucking Employees of North Jersey

Welfare Fund, Inc. v. Bellezza Co., 57 Fed. Appx. 972 (3d Cir. 2003); International Painters and

Allied Trades Industry Pension Fund v. H.W. Ellis Painting Co., Inc., No. 03-1125, slip. op. at

*3 (D.D.C. February 10, 2004) (citing Free v. Briody, 793 F.2d 807 (7th Cir. 1986); Sheet Metal

Workers Health and Welfare Trust Fund v. Big D Service Co., 867 F.2d 852 (10th Cir. 1989)).

9.      If Defendants fail to comply with any of the terms of this Order, the Plaintiff may,

in addition to pursuing the remedies provided for under Federal Rule of Civil Procedure 69,

reopen this case upon motion to the Court and notice to the Defendants, and may at that time ask

for further appropriate monetary and/or injunctive relief.

<div align="center">BY THE COURT</div>

Date:_____    By: _____
                                       Rosemary M. Collyer,        J.
                                       United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND<br><br>       Plaintiff,<br><br>  v.<br><br>SUPERIOR INTERIORS INC.,<br> a/k/a Superior Interior, *et al.*<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CIVIL ACTION NO.<br>   1:06-cv-2010 (RMC) |

## <u>DECLARATION OF THOMAS MONTEMORE</u>

THOMAS MONTEMORE states and declares the following:

1. My name is Thomas C. Montemore and I am the Assistant to the Fund Administrator of the International Painters and Allied Trades Union and Industry Pension Fund ("Pension Fund", "Fund" or "Plaintiff"). I have held that position since February 1, 2000. I served as Delinquency Controller from 1988 through October 31, 2000 and I have served as the Delinquency Coordinator from 1986 to 1988, and before that, acted as Agreement Clerk from 1982 to 1986, and File Clerk beginning in 1979.

2. The Pension Fund is an "employee benefit pension plan" as defined in Section 3(2)(A)(i) of ERISA, as amended, 29 U.S.C. §1002(A)(i), established by the International Union of Painters and Allied Trades, AFL-CIO-CFL ("Union"), and employers in private industry whose employees are members of or otherwise represented by the Union and its district councils and local unions, for the purpose of providing retirement income to the employees. The Pension



Fund is administered in the District of Columbia from its and my principal place of business at 1750 New York Avenue, N.W., Washington, D.C. 20006.

3.     I have personal knowledge of the contents of the collective bargaining agreements, the Agreement and Declaration of Trust ("Trust Agreement") and the International Painters and Allied Trades Industry Pension Plan ("Plan") referenced in this Motion.

4.     The Pension Fund, as part of its normal operating procedure, maintain files containing copies of the collective bargaining agreements signed by each employer and copies of the remittance reports submitted by each contributing employer. The Pension Fund also maintains, as part of its normal operating procedures, a record of all contributions which are paid to the Pension Fund by each contributing employer, including copies of checks submitted directly from employers as payment for contributions due.

5.     Defendant, Superior Interiors Inc., a/k/a Superior Interior ("Company") in an Connecticut corporation located in East Windsor, Connecticut. Frank LaTeano ("Individual Defendant" and together with Company, "Defendants") is the Vice President of Company. See Exhibit 3. In addition, Individual Defendant guaranteed the statutory and contractual liabilities of Company by signing the April 18, 2006 Promissory Note ("Note") and Personal Guarantee ("Guarantee"). True and correct copies of the Note and Guarantee are attached as Exhibit 3.

6.     Defendants are currently employers that are party to or bound by collective bargaining agreements ("Labor Contract") with the Union. True and correct copies of relevant provisions of the Labor Contract are attached as Exhibit 2. Under the terms of the Labor Contract, Company is bound to the Trust Agreement and Plan. See, Exhibit 2, Labor Contract, Art. XV.

179678-1                                        2

7.     The Labor Contract requires Company to submit monthly contributions to the
Pension Fund on behalf of all employees in the bargaining unit, and sets forth the rate of
contribution and the method for calculating the total amount of contributions due the Pension
Fund. Contributions must be made for each hour for which employees receive pay at the
contribution rate specified in the agreements. Failure to make the required contributions, or to
submit either incorrect or late remittance reports and contributions, results in a delinquency to
the Pension Fund.

8.     The Defendants previously incurred contribution delinquencies to the Fund.  In
settlement of those delinquencies, the Defendants entered a settlement agreement with the
Pension Fund on September 20, 2005 by signing a Promissory Note and Personal Guarantee
("September 20, 2005 Settlement") for the principal sum of $131,916.99.   True and correct
copies of the September 20, 2005 Settlement is attached as Exhibit 4.  The Defendants' failure to
timely remit either an installment under the September 20, 2005 Settlement or future fringe
benefit contributions payments to the Pension Fund were among the grounds for default under
the terms of the September 20, 2005 Settlement.  Individual Defendant personally guaranteed the
settlement payments and Company's other contributory obligations.  See Exhibit 4.  Defendants
breached the terms of the September 20, 2005 Settlement by failing to make one or more
installment payments under the agreement to the Pension Fund.   Subsequently, Defendants
entered a second settlement agreement on April 18, 2006, to pay the remaining amounts due.
See Exhibit 3, Note and Guarantee.  Defendants breached the terms of the Note by failing to
make one or more installment payments under the Note to the Pension Fund.  Individual
Defendant is personally liable for all amounts due by Company pursuant to the Guarantee.  See

Exhibit 3, Note and Guarantee. The remaining principal balance on the defaulted Note is

$55,459.10 and is detailed (interest and liquidated damages) below together with the amounts

currently due.

9.      Based upon information currently available to the Pension Fund, Defendants

presently owe the Pension Fund contributions for the period July 2006 through December 2006

in the amount of at least $147,977.40.   This amount includes an estimate for the period of

September 2006 through December 2006, a period for which Defendant has failed to submit both

contributions <u>and</u> remittance reports to the Pension Fund. For the period in which the Pension

Fund has not received remittance reports and corresponding contributions, the Pension Fund is

forced to estimate an amount due from Defendants. The estimate is reached by averaging the

three months of contributions prior to the first month in which no report is received. Using this

methodology, the Pension Fund has calculated the amount due for each of the months in the

period as follows:

| MONTH | AMOUNT |
|---|---|
| June 2006 | $ 28,868.01 |
| July 2006 | $ 20,280.25 |
| August 2006 | $ 26,642.63 |
| TOTAL | $ 75,790.89 |

$75,790.89 divided by three equals $25,263.63, which is used as the

estimated contribution amount due for each of the four months in the

period.  $25,263.63 times four equals $101,054.52 which is used as the

estimated contribution amount due for the period of September 2006

through December 2006.

10.    Defendants owe interest through February 15, 2007 in the amount of $7,698.20[1] on the unpaid pension contributions set forth in ¶9 and on the remaining balance under the defaulted Note set forth in ¶8.  The interest has been calculated in accordance with the fluctuating IRS interest rate, as provided at section 10 of the Plan.

11.    Section 10 of the Plan parallels the ERISA statute, 29 U.S.C. § 1132(g)(2), and requires the assessment of liquidated damages against Defendants in an amount equal to the greater of the following: the amount of interest owed on the delinquent principal, or twenty percent (20%) of the delinquent principal. As noted above, the total interest owed through February 15, 2007 is $7,698.20. Twenty percent (20%) of Defendants' unpaid contributions and contributions paid past the due date total $40,687.31. Since the total amount of liquidated damages is greater than the interest amount, Defendants owe $40,687.31 in liquidated damages.

12.    The Pension Fund routinely audits employers to ensure all required contributions are being paid. It also audits employers in connection with delinquency collection lawsuits. An audit is the most accurate tool employed by the Pension Fund to ensure an employer's compliance with its statutory obligations. In performing these audits, the auditor reviews the payroll records of each employee who performs work of the type covered by the collective bargaining agreement. These records will include time cards, payroll ledgers, payroll summaries, time slips, or such other payroll records as the employer maintains which will indicate the number of hours that each individual employee worked and was paid for each week. The

---

[1] Total interest of $7,698.20 includes the following:

| | | |
|---|---|---|
| Balance of defaulted April 18, 2006 Promissory Note | Interest through 4/30/06 | $987.00 |
| | Amortized interest through 2/15/07 | $3,456.59 |
| Unpaid contributions for 7/06 and 8/06 | Through 2/15/07 | $1,659.89 |
| Estimated unpaid contributions for 9/06 through 12/06 | Through 2/15/07 | $1,594.72 |
| TOTAL | | $7,698.20 |

information gathered from these records is then compared to the wage information found on the employer's federal, state and municipal tax returns and on the W-2 statements provided to the employees. The auditor also reviews disbursement ledgers and check registers to identify potential wage payments to employees not made through the payroll system. Job/project contracts are reviewed to determine whether the work performed is within the scope of the collective bargaining agreement. After compiling the information gathered from the above records, a schedule of the contributions that should have been paid according to the contract is prepared. This schedule, which is broken down by month, is then compared to the actual contributions which the employer did submit to the Pension Fund, with any differences noted. Once completed, an audit report is forwarded to the employer for its review and payment.

13.    Despite a continuing contractual obligation to do so, Defendants have repeatedly failed to submit timely remittance reports and pension contributions. The Pension Fund and its Trustees are required to pay benefits to all properly eligible employees of contributing employers. Employees of contributing employers continue to accrue pension credits, based on the hours of their employment, regardless of whether their employers make pension contributions on their behalf for these hours, as contractually required. The Pension Fund's obligation to recognize pension credits and to pay pensions to vested employees is absolute and continues even if the employers fail to pay their required pension contributions. Employer contributions <u>and</u> the earnings the Pension Fund receives by investing these contributions comprise the assets from which the Pension Fund pays retirement benefits to participants and their dependents and beneficiaries. When employers, like Defendants, fail to pay their contributions or do not pay them timely, the Pension Fund is deprived of the investment income

179678-1                                6

they otherwise could have earned. In addition, the Pension Fund also must engage in time-consuming and costly efforts to collect the unpaid contributions. These efforts include letters and phone calls to the employer, investigating other sources for collection and attempting to calculate delinquency amounts and benefit eligibility through other sources (e.g. paystubs), if available. Further, the Pension Fund has to process benefit eligibility and benefit claims manually so that participants (and their dependents) employed by the delinquent employer are not deprived of retirement benefits. The actual losses and added costs (in terms of dollar amount, capital and manpower) incurred by the Pension Fund in connection with an employer contribution delinquency are not capable of precise determination, but they are substantial. Defendants' refusal to contribute as it is bound means irreparable harm and injury to the Pension Fund – an obligation to make benefit payments to employees without necessary contributions from Defendants to cover those benefits. Therefore, Defendants should be required to submit timely current contributions and remittance reports in the future.

14.    I have executed this Declaration in support of Plaintiff's Motion for Default Judgment against Defendants and request that this Court consider the same as proof in support of the allegations contained in the Plaintiff's Complaint and other facts stated in this Declaration.

Pursuant to 28 U.S.C. §1746, I declare under Penalty of perjury that the foregoing is true and correct.

Executed on: __2/12/07__

THOMAS MONTEMORE

# WORKING AGREEMENT

## Between

## PAINTERS, DRYWALL FINISHERS, GLAZIERS AND ALLIED TRADES DISTRICT COUNCIL 11

### of the

## INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO, CLC

### And the

## PAINTING, DECORATING, DRYWALL FINISHING, GLASS AND GLAZING CONTRACTORS

### of Connecticut, Massachusetts, and Rhode Island

## June 1, 2005 – May 31, 2009



# TABLE OF CONTENTS

PAGE

AGREEMENT AND PREAMBLE.................................................................... 1

ARTICLE 1       RECOGNITION CLAUSE.................................................. 1

ARTICLE II      WORK JURISDICTION...................................................1-5

ARTICLE III     UNION SECURITY CLAUSE ............................................ 6

ARTICLE IV      OUT OF AREA WORK CLAUSE ........................................ 7

ARTICLE V       SUPPORT OF PRIMARY ACTIVITY ................................... 8

ARTICLE VI      TERRITORIAL JURISDICTION ......................................... 8

ARTICLE VII     JOB REGISTRATION ...................................................... 8

ARTICLE VIII    HOURS OF WORK .......................................................... 8

ARTICLE IX      BRIDGE PAINTING ........................................................ 9

ARTICLE X       APPRENTICE BENEFITS AND RATIOS ............................10

ARTICLE XI      FRINGE BENEFIT CONTRIBUTIONS ...........................10-12

ARTICLE XII     CENTRAL COLLECTION SYSTEM ...................................12

ARTICLE XIII    PAYMENT OF WAGES ...................................................12

ARTICLE XIV     MARKET RECOVERY / WAGE RATES ...............................13

ARTICLE XV      EMPLOYER CONTRIBUTIONS &
                PAYROLL DEDUCTIONS ...........................................14-20

ARTICLE XVI     UNION REPRESENTATION .............................................21

ARTICLE XVII    INSURANCE ................................................................22

ARTICLE XVIII   SAFETY ......................................................................22

ARTICLE XIX     NO SUBCONTRACTING CLAUSE......................................23

ARTICLE XX      PRESERVATION OF WORK.............................................23

ARTICLE XXI    FUNCTION OF MANAGEMENT ........................................24

ARTICLE XXII   GRIEVANCE PROCEDURE..........................................24-26

ARTICLE XXIII  GENERAL SAVINGS CLAUSE.........................................26

ARTICLE XXIV   DURATION CLAUSE....................................................27

                ACCEPTANCE OF AGREEMENT....................................28

ADDENDUM I     GLAZIERS ...................................................................1-4

ADDENDUM II    CONNECTICUT PAINTERS, PAPERHANGERS & TAPERS...1-4

ADDENDUM II    APPENDIX A (Paper Hangers Piece Work)............................ 5

ADDENDUM III   RHODE ISLAND PAINTERS, PAPERHANGERS & TAPERS..1-4

ADDENDUM III   APPENDIX A (Paper Hangers Piece Work)............................ 5

# AGREEMENT

This Agreement is made and entered into this 1st day of June, 2005, and is effective until May 31, 2009.

# PREAMBLE

It is the intent and purpose of the parties to this Agreement to promote harmonious cooperation between the Union, Employer, and Employees, to provide orderly collective bargaining relations between the Union, Employer, and Employees, to provide a procedure for the prompt, fair, and peaceful adjustment of all disputes or differences which might arise from time to time, and to provide for the operation of the business of the Employer by methods which will further, to the fullest extent possible, efficiency of operation, quality, and quantity of performance and the protection of the property of the Employer, and that there shall be no interference with the operation of the business of the Employer during the term of this Agreement.

Each of the parties to this Agreement agrees that it is the duty of the Union, Employer, and Employees to cooperate faithfully, fully, and individually and collectively in the observance of the provisions of this Agreement.

# ARTICLE I

## RECOGNITION CLAUSE

The Employer recognizes, acknowledges, and agrees that District Council 11 is, within the meaning of Section 9(a) of the National Labor Relations Act, the exclusive representative for the purpose of collective bargaining, of all the Employer's employees wherever such employees may be employed, in the following classifications of work:

# ARTICLE II

## WORK JURISDICTION

This District Council shall have jurisdiction over all workers engaged in: all painting, decorating and coatings applications and wall covering; all levels of drywall and wall finishing; any and all labor, material, tools or equipment for preparatory work or surface treatment work in relation to painting, decorating and coatings applications, wall covering, drywall and wall finishing; glazing; architectural metal and glass work; paint and coatings manufacturing; sign, convention and display work; show decorators; scenic artists and designers; metal polishers; civil service, public and professional employees; book binding; maintenance work; chemical, clerical and warehouse workers; any and all units, as well as apprenticeable crafts, that have historically been part of this District Council; and any and all work as may be obtained and maintained through organizing and collective bargaining. Such work shall include, but is not limited to:

**(a)     PAINTERS**

Work will include, but not be limited to: (1) preparation, application and removal of all types of coatings and coating systems in relation to all painting, decorating, protective coatings, coating and staining of concrete floors and toppings, waterproofing, masonry restoration, fireproofing, fire retarding, metal polishing, refinishing, sealing, lining, fiberglassing, E-Glass fiberglass, carbon fiber, encapsulating, insulating, metalizing, flame spray, the application of Exterior Insulating Finishing Systems; (2) each and all such applications, and similar or substitute applications, on all surfaces, interior and exterior, to include, but not be limited to: residences; buildings; structures; industrial, power, chemical and manufacturing plants; bridges; tanks; vats; pipes; stacks; light and high tension poles; parking, traffic and air strip lines; trucks; automobile and railroad cars; ships; aircraft; and all machinery and equipment; (3) any and all material used in preparation, application or removal of any paint, coatings or applications, including, but not limited to: the handling and use of thinners, dryers, sealers, binders, pigments, primers, extenders, air and vapor barriers, emulsions, waxes, stains, mastics, plastics, enamels, acrylics, alkyds, epoxies, epoxy injection and T Lock welding, sheet rubber, foams, seamless and tile-like coatings, etc.; (4) all preparation for and removal of any and all materials for finishes, such as deep cleaning, patching, all levels of finishing, taping/finishing, skim coating, pointing, caulking, high pressure water, chemical and abrasive blasting, environmental blasting, wet/dry vacuum work, chemical stripping, scraping, air tooling, bleaching, steam cleaning, asbestos and lead abatement/removal; (5) the inspection of all coatings and coating systems during their applications will be performed by members of this District Council.

**(b)     WALL COVERING**

Work will include, but not be limited to: (1) all material applied to walls or ceilings with adhesive, staples, tacks, by stretching or adhered by any other method, including all papers, vinyls, flexible woods, fabrics, borders, metals, upholstered wall systems, the fabric covered panels made of plastic/wood or prefinished products of micor fiberglass, etc., acrovin and various plastic wall coverings such as wainscot, caps, corner moldings and accessories; (2) any and all preparation of walls and ceilings such as scraping or any methodology for removal of existing materials, including patching, leveling, skim coating and priming.

**(c)     DRYWALL FINISHING**

Work will include, but not be limited to: (1) the preparation or leveling of any surface or substrate which is to receive a coating, finish and/or wall covering; this will include, but not be limited to, all levels of finishing and/or spackling of all surfaces, including gypsum wallboard taping and finishing, fire taping and all firestopping systems, glaze coatings, skim coating or any other finishing system, spotting of nails, installation and finishing of corner beads/flex beads. Patching and sanding is within the system of preparing surfaces for finishes. (2) All stucco and dryvit systems will be performed by members of this District Council.

2

**(d)    GLAZING, ARCHITECTURAL METAL AND GLASS WORKERS**

General Glazing will include, but not be limited to: (1) the installation, setting, cutting, preparing, fabricating, distributing, handling or removal of the following: Glass and Glass substitutes used in place of glass, pre-glazed windows, retrofit window systems, mirrors, curtainwall systems, window wall systems, suspended glass systems, louvers, skylights, entranceways including automatic doors, patio doors, store front, column covers, panels and panel systems, glass hand rails, decorative metals as part of the glazing system, and the sealing of all architectural metal and glass systems for weatherproofing and structural reasons.  Art glass, prism glass, beveled glass, leaded glass, automotive glass, protection glass, plate glass, window glass, wire glass, ribbed glass, ground glass, colored glass, figured glass, vitrolite glass, carrara glass, all types of opaque glass, glass chalk boards, structural glass, tempered and laminated glass, thiokol, neoprene, all types of insulating glass units, all plastics or other similar materials when used in place of glass to be set or glazed in its final resting place with or without putty, vinyl, molding, rubber, lead, sealants, silicone and all types of mastics in wood, iron, aluminum, sheet metal or vinyl sash, doors, frames, stone wall cases, show cases, book cases, sideboards, partitions and fixtures; (2) the installation of the above systems materials when in the shop or on the job site, either temporary or permanent, on or for any building in the course of repair, remodel, alteration, retrofit, or construction; (3) the installation and welding of all extruded, rolled or fabricated materials including, but not limited to, all metals, plastics and vinyls, or any materials that replace same, metal and vinyl tubes, mullions, metal facing materials, corrugated flat metals, aluminum panels, muntins, facia, trim moldings, porcelain panels, architectural porcelain, plastic panels, unitized panels, showcase doors, all handrails and relative materials, including those in any or all types of building related to store front, door/window construction and curtain wall systems; (4) the installation of automatic door entrances, door(s) and window(s) frame assemblers such as patio sliding or fixed doors, vented or fixed windows, shower doors, bathtub enclosures, storm sash where the glass becomes an integral part of the finished product, including the maintenance of all of the above; (5) bevellers, silverers, scratch polishers, abrasive blasters, flat glass wheel cutting, mitre cutters, engravers, hole drilling, machine operations belt machines and all machines used in the processing of glass, automatic beveling, silvering, grinding, polishing, unpacking and racking of glass, packing glass, glass cleaners in shops, mirror cleaning, assembling, framing and fabrication and assembling of all insulated and non-insulated units, fabrication and mounting of mirrors and the operations of all machines and equipment for these operations; (6) the selecting, cutting, preparing, designing, art painting, and installing of fused glass, thick facet glass in concrete and cementing of art glass, and the assembly and installing or removal of all art glass, engraving, drafting, etching, embossing, designing, abrasive blasting, chipping, glass bending, glass mosaic workers, cutters of all flat and bent glass; glass shade workers, and glaziers in lead or other metals; the fabrication and distribution of all glass and glass-related products; (7) any and all transportation, handling, unloading and loading of tools, equipment and materials will be performed by members of this District Council.

3

**(e)    PAINT MAKERS**

Will include, but not be limited to all workers engaged in the mixing, testing, preparing and/or manufacturing of paint, coating, caulking, putty, sealants, etc. and handling of lead, color, oil, lacquer, varnish, synthetic resin, acrylic paints and coatings, etc., including any and all materials for the same.

**(f)    SIGN AND DISPLAY**

Sign and Display Painters' work shall include, but not be limited to: (1) the making and installation of all signs and servicing of same, designing, lettering and pictorial work of any kind, including vinyl signs and vinyl substrates and the preparing for the finishing of same, be it by hand brush, roller, spray, mechanical or computer-aided and by any other method or process pertaining to same; (2) they shall have control of all branches, methods and processes of screen process work; tube bending and display work such as creating, designing, building and finishing of all display matter and its related operations used for advertising purposes, including all art work and lettering whether it is done by hand, mechanical or computer aided or by any other method or process pertaining to same; (3) the construction, erection and maintenance of all billboards and all communication advertising will be done by members of this District Council.

**(g)    DISPLAY CONVENTION AND SHOW DECORATORS**

The display convention and show decorators' work will include, but not be limited to: (1) the delivery, loading and unloading and the installation and removal of all exhibits (floor to ceiling) and related materials in connection with trade shows and conventions, including, but not limited to: trade show and convention booth assembly and disassembly; installation and removal of interior and exterior decorations, flags, drapes and other display materials; uncrating, assembly, installation, removal, disassembly and recrating of all commercial exhibits; (2) the installation and dismantling of furniture owned by the employer, the installation and removal of floor coverings and special event displays; (3) the construction, preparation, erection and maintenance of all signs, lettering, pictorial work, screen process work, show card writing, commercial exhibits and fabrication of advertising displays and pattern and sketch making, scale model making, the preparation of training aids and mockups and application of plastic, scotchlite and similar reflective materials.

**(h)    SCENIC ARTISTS AND DESIGNERS**

Scenic Artists' and Designers' work will include, but not be limited to: models, sketches, carpenter drawings, painting for theatrical productions, motion picture settings and all the various effects; the painting of properties and decorations which may be used to decorate stage, motion picture and TV settings, mural paintings, display creations, costumes and the art of make-up and all its various effects.

**(i)     METAL POLISHERS**

Metal Polishers' work will include, but not be limited to: new construction and existing sites consisting of metal polishing, both the initial and continuing maintenance which shall include, but not be limited to, coloring, lacquering, spraying, application of vinyl coatings, cleaning, polishing and finishing of ornamental and architectural iron, bronze, brass, nickel, aluminum, stainless steel and all metal specialty work.

**(j)     ALL TOOLS, EQUIPMENT AND MATERIAL**

(1) the handling, assembling, disassembling, operation, maintenance, storage and transporting of all tools, equipment and material used or that may be used by members of this District Council in performing their trade or work; (2) the loading and unloading of any and all materials, tools and equipment will be done by any members and units coming under the District Council's jurisdiction; (3) tools, material and equipment, as used herein, shall include, but not be limited to, brushes, rollers, spray painting equipment, coating applicators, all miscellaneous hand and power driven tools, all robotic, computerized mechanical and manually operated abrasive, shot, bead, water and related blasting equipment, containment systems, ventilation/dehumidification systems, vacuum recovery units, wet and dry vacuum systems and any and all related safety equipment, ladders, scaffolding, lifts and all other dedicated rigging, including the handling, erection and dismantling of same, the operation and maintenance of all types and sizes of compressors.

**(k)     RELATED WORK**

Members of this District Council shall also have jurisdiction of: (1) all processes and procedures for decontamination of all contaminated areas; (2) all clean-up of any type of debris caused by or during the preparation and/or application of any work described in this Section.

**(l)     TECHNOLOGICAL IMPROVEMENTS, ADVANCEMENTS, NEW OR SUBSTITUTE SYSTEMS OR PROCESSES AND/OR NEW OR SUBSTITUTE MATERIALS**

The jurisdiction of this District Council shall include and extend to any and all new or substitute system or processes, new or substitute materials and technological improvements or advancements in any existing or new system, process or material that is referred to or incorporated in any provisions in the General Constitution or any collective bargaining agreement to which the International or any of its subordinate bodies is a party.

The foregoing is not all inclusive and may be enlarged or otherwise changed by the action of the General Executive Board. Such changes shall automatically become part of this Agreement when enlarged or otherwise changed by action of the General Executive Board or the General Convention. The parties to this Agreement agree to adhere to all changes made, by mutual consent, in accordance with this Section.

5

# ARTICLE III

## UNION SECURITY CLAUSE

**SECTION 1.** All present employees who are members of the Union on the effective date of this Agreement or on the date of execution of this Agreement, whichever is later, shall remain members of the Union in good standing as a condition of employment. All present employees who are not members of the Union and all employees who are hired hereafter shall become and remain members in good standing of the Union as a condition of employment on and after the eighth (8th) day following the beginning of their employment, or on and after the eighth (8th) day following the effective date of this Agreement or the date of execution of this Agreement, whichever is later. In the event that a workman fails to render the application processing fee or that a member of the Union fails to maintain his membership in accordance with the provisions of this Section, the Union shall notify the Employer in writing and such notice shall constitute a request to the Employer to discharge said individual worker(s) within forty-eight (48) hours (Saturdays, Sundays, and Holidays excluded) for failure to maintain continuous good standing in the Union in accordance with its rules above referred to in this paragraph, and the Employer shall discharge such workers at the end of such period.

**SECTION 2.** In the employment of workers for all work covered by this Agreement, the following provisions shall govern:

**SECTION 2(a)**   When the Employer needs additional or new employees, it shall give the Union equal opportunity with all other sources to provide suitable applicants consistent with this Agreement. The Employer shall not be required to hire those referred by the Union.

The Employer will give the Union no less than twenty-four (24) hours notice prior to hiring additional employees so its representative can supply a list to its unemployed members who are available for work and post notice in its day room so its members can make application with the Employer for the available work.

If the Union is unable to refer qualified applicants for employment to the Employer within twenty-four (24) hours from the time of receiving such request, the Employer shall be free to secure applicants without using the referral procedures.

When exercising their right to hire employees from any source, the Employer agrees to give preference to those applicants who have exhibited experience that can be documented by:

(1)     A satisfactory work history performing the available work with said Employer.

(2)     A reasonably active work history performing the available work under the terms and conditions of this Working Agreement.

(3)     A reasonably active work history performing the available work.

**SECTION 2(b)**   If workers are so employed, the Employer shall, within twenty-four (24) hours, report to the Union or its agent such workers by name and social security number.

**SECTION 2(c)**    When employing workers, the Employer shall notify the Union within twenty-four (24) hours giving the worker's name, social security number, address, telephone number, and employment location.

**SECTION 2(d)**    The Employer has the right not to hire any applicant for employment and to fire any employee for just cause.

**SECTION 3.**  In the event that any Employer violates any of the provisions of this Section, the Union may resort to all available legal or economic recourse including cancellation of this Agreement, notwithstanding any other provisions of this Agreement.

# ARTICLE IV

## OUT OF AREA WORK CLAUSE

**SECTION 1.**  The Contractor or the Employer party to this Agreement, when engaged in work outside the geographical jurisdiction of the Union party to this Agreement, shall employ not less than fifty percent (50%) of the workers employed on such work from the residents of the area where the work is performed or from among persons who are employed the greater percentage of their time in such area; any others shall be employed only from the contractor's home area.

**SECTION 2.**  When an Employer or contractor from an area outside the geographical jurisdiction of District Council 11 is engaged in work within the geographical jurisdiction of District Council 11, he shall employ not less than fifty (50%) of the employees employed on such work from among the residents of the area where the work is performed or from among persons who are employed the greater percentage of their time in such area.  Any others shall be employed only from the Employer's home area.

**SECTION 3.**  The Employer party hereto shall, when engaged in work outside the geographical jurisdiction of the Union party to this Agreement, comply with all of the lawful clauses of the Collective Bargaining Agreement in effect in said other geographic jurisdiction and executed by the Employers of the industry and the affiliated local unions in that jurisdiction, including but not limited to, the wages, hours, working conditions, fringe benefits, and procedure for settlement of grievances set forth therein; provided however, that where no affiliated Union has a current effective agreement covering such out-of-area work, the Employer shall perform such work in accordance with this Agreement; and provided further that as to Employees employed by such Employer from within the geographic jurisdiction of the Union party to this Agreement and who are brought into an outside jurisdiction, such employees shall be entitled to receive the wages and conditions effective in either the home or outside jurisdiction, whichever are more favorable to such employees, and fringe benefit contributions on behalf of such employees shall be made solely to their home Funds in accordance with their governing documents, and the difference between the wages and benefit contributions required by the away Funds and the home Funds, if any, shall be paid to the employees as additional wages.  This provision is enforceable by the District Council or Local Union in whose jurisdiction the work is being performed, both through the procedure for settlement of grievances set forth in its applicable Collective Bargaining Agreement and through

7

the courts, and is also enforceable by the Union party to this Agreement, both through the procedure for settlement of grievances set forth in this Agreement and through the courts. The Employer shall not be permitted to evade its obligations hereunder by setting up an additional "home" or "branch" office or plant in an area outside its principal place of business.

# ARTICLE V

## SUPPORT OF PRIMARY ACTIVITY

Employees covered by this Agreement shall have the right to respect any legal primary picket line validly established by any bona fide labor organization, and the Union party to this Agreement has the right to withdraw employees covered by this Agreement whenever the Employer party to the Agreement is involved in a legitimate primary labor dispute with any bona fide labor organization.

# ARTICLE VI

## TERRITORIAL JURISDICTION

District Council 11 territorial jurisdiction is as follows: all cities and towns in the State of Connecticut and Rhode Island inclusive, and Fishers Island. Glaziers' Massachusetts jurisdiction is as follows: the Counties of Dukes, Barnstable, Bristol, Nantucket, Franklin, Hampden, and Hampshire.

# ARTICLE VII

## JOB REGISTRATION

Employers shall register all jobs prior to starting, including out-of-area jobs, whether residential, commercial, or industrial by either phone or fax with the District Council 11 office. Any employer failing to do so may be found in violation by the District Council 11 Joint Trade Board.

# ARTICLE VIII

## HOURS OF WORK

**SECTION 1.** The regular work day shall be eight (8) hours, from 7:00/8:00AM to 11:00/12:00 noon and 11:30/12:30PM to 3:30/4:30PM. One-half (1/2) hour from 11:00/12:00 noon to 11:30/12:30PM shall be observed as the lunch period. The regular work week shall be forty (40) hours, Monday through Friday, beginning at 7:00/8:00AM on Monday and ending at 3:30/4:30PM on Friday.

8

**SECTION 2.** All hours in excess of the regular work day and work week and all work performed outside of the regular work day or week shall be considered overtime. Overtime on days recognized as regular work days or on Saturdays shall be paid for at the rate of one and one-half times the regular rate. Overtime on Sundays shall be paid as stated in the applicable Addendum. Holidays shall be paid for at the rate of double time.

**SECTION 3.** All shift rates shall be paid as stated in the applicable Addendum.

**SECTION 4.** Employees shall be given forty eight (48) hours notice before being required to change shifts. If not, regular overtime rules will apply.

**SECTION 5.** There shall be a thirty (30) minute lunch period allowed on all shifts.

**SECTION 6.** Coffee breaks will be allowed in accordance with the applicable Addendums.

**SECTION 7.** All overtime shall be reported to the District Council office either by phone or fax. All overtime shall be distributed equally, if possible, to all workers currently working on the project where the overtime is to be worked. The Steward shall enforce this provision and be included in all overtime work.

**SECTION 8.** There shall be at least one (1) Foreman to every five (5) working members on the job or fraction thereof.

**SECTION 9.** Whenever the Employer deems it necessary to employ a General Foreman on any particular project, the General Foreman shall be a member of District Council 11 and the General Foreman (except in emergencies or in the absence of the General Foreman) is the only representative of the Employer who shall issue instructions to the Foreman.


# ARTICLE IX

## BRIDGE PAINTING

Bridge painting shall be performed under the terms and conditions of the District Council 11 Bridge Agreement.

# ARTICLE X

## APPRENTICE BENEFITS AND RATIOS

**SECTION 1.** Pension and Annuity for first and second year apprentices shall be as follows: First year $0.50 pension and $0.50 annuity. Second year $0.50 pension and $1.00 annuity. Third year apprentices shall receive full fringe benefits for all hours worked, with the exception of Connecticut Painters and Paperhangers. Those rates are contained in Addendum II.

**SECTION 2.** Ratio of Apprentices

Every Employer who employs three (3) or more journeymen shall employ at least one (1) apprentice. The J.A.T.C. will establish the ratio and maximum number of apprentices per Employer in addition to the above.

**SECTION 3.** All working rules and regulations governing apprentices other than those contained in this Agreement shall be as set forth in District Council 11's J.A.T. Standards.

# ARTICLE XI

## FRINGE BENEFIT CONTRIBUTIONS

Employers hereunder shall make contributions to the fringe benefit trust funds enumerated, hereinafter referred to as the "Funds", in the amounts set forth below for each hour worked by each employee covered under this Agreement on and after the effective dates indicated:

*International Union of Painters and Allied Trades Union and Industry Pension Fund*

| Effective Date | Hourly Rate |
| --- | --- |
| June 1, 2005 | $ 3.00 |
| June 1, 2007 | $ 3.15 |
| June 1, 2008 | $ 3.30 |

*International Union of Painters and Allied Trades Union and Industry Annuity Fund*

| Effective Date | Hourly Rate |
| --- | --- |
| June 1, 2005 | $ 2.45 |
| June 1, 2006 | $ 2.60 |
| June 1, 2008 | $ 2.75 |

### District Council 11 Health & Welfare Fund *

| Effective Date | Hourly Rate |
|---|---|
| June 1, 2005 | $ 5.70 |
| June 1, 2006 | $ 6.20 |
| June 1, 2007 | $ 6.70 |
| June 1, 2008 | $ 7.20 |

* Painters and Allied Trades Local Union No. 195 Health & Welfare Fund rates shall be paid in accordance with the amounts set forth in Addendum III.

### District Council 11 Joint Apprenticeship and Training Fund

| Effective Date | Hourly Rate |
|---|---|
| June 1, 2005 | $ 0.40 |
| June 1, 2006 | $ 0.45 |
| June 1, 2007 | $ 0.50 |
| June 1, 2008 | $ 0.55 |

### District Council 11 STAR Program Fund

| Effective Date | Hourly Rate |
|---|---|
| June 1, 2005 | $ 0.05 |
| June 1, 2006 | $ 0.10 |
| June 1, 2007 | $ 0.15 |
| June 1, 2008 | $ 0.20 |

### Labor Management Cooperation Fund

| Effective Date | Hourly Rate |
|---|---|
| June 1, 2005 | $ 0.05 |
| June 1, 2008 | $ 0.10 |

### Labor Management Partnership Fund (State of Rhode Island only)

| Effective Date | Hourly Rate |
|---|---|
| June 1, 2005 | $ 0.05 * |

* This is an Employer deduction for Local 195 members.

*Foundation For Fair Contracting (not applicable in Rhode Island)*

| **Effective Date** | **Hourly Rate** |
|---|---|
| June 1, 2005 | $ 0.05 |

*Political Action Fund*

| **Effective Date** | **Hourly Rate** |
|---|---|
| June 1, 2005 | $ 0.05 |

\*\*\* **PLEASE NOTE**:    *Foundation For Fair Contracting* and the *Political Action Fund* are employee deductions.  All other contributions are the responsibility of the Employer.

# ARTICLE XII

# CENTRAL COLLECTION SYSTEM

The Employer shall, with respect to any and all contributions or other amount that may be due and owing to the IUPAT and its related or affiliated Funds or organizations, including, but not limited to, the IUPAT Industry Pension Plan, the IUPAT Industry Annuity Plan, the IUPAT Joint Apprenticeship & Training Fund, the Painters and Allied Trades Labor Management Cooperation Initiative, the IUPAT Political Action Together (and any and all other affiliated International organizations as they may be created or established in the future), upon receipt of a written directive to do so by the affiliated Funds and organizations, make all required payments, either directly or through an intermediate body, to the 'Central Collections' Unit of the International Union and its affiliated Funds and organizations.  Such contribution shall be submitted on appropriate forms, in such format and with such information as may be agreed to by Central Collections.

# ARTICLE XIII

# PAYMENT OF WAGES

Employees shall be paid weekly, not later than Friday, at the place where the work is performed or a mutually acceptable location.

**SECTION 1**.  All wages shall be paid in cash or negotiable check and shall be accompanied by a statement of gross earnings and any deductions legally made.  Such statement shall show the Employer's name, the hourly rate of pay, the dates and hours worked, all deductions made and the

net amount due the employee. Wage payments shall conform with all applicable Federal and State laws.

**SECTION 2.** The Employer agrees to show all data on weekly pay envelope/check stub.

**SECTION 3.** When an Employee is laid off, he/she shall receive his/her pay in full one-half (1/2) hour before quitting time and shall be allowed to pack his/her gear and clean up at that time and leave the job.

**SECTION 4.** The Employer agrees not to lay off workers before one-half (1/2) hour before quitting time except in cases where the job is completed, or bad weather prohibits work.

**SECTION 5.** Four (4) hours show up time shall be paid to an employee not notified prior to quitting time that he/she would not be working on the next normal work day.

**SECTION 6.** On all jobs bid by an employer regardless of type, the wage and fringe rates contained in this Agreement shall be paid to all employees for the current effective dates for wages and fringes. Any and all wage and fringe increases which may occur during an ongoing job shall automatically apply to all members of District Council 11 when due, regardless of bid price when job was originally bid. Wage rates and fringe rates are listed in this current Agreement by effective dates so as to allow the employer when bidding a job to select the proper current wages and fringes and the proper future wages and fringes. Failure to pay the proper wages and or fringes then current will result in an automatic violation of this Agreement and be subject to Joint Trade Board actions and/or fines, after due process, which may include back pay and fringes and all costs associated with any legal fees or actions needed to enforce the foregoing provision.

**SECTION 7.** The Employer shall, at the termination of a job, enclose with each employee's wages the appropriate State Unemployment Notice Form, stating the date last worked and the reason for being laid off. Failing to comply with this rule, the Contractor will be subject to penalty of continuance of wages until officially laying off the Employee by producing the proper form as required by law.

## ARTICLE XIV

## MARKET RECOVERY / WAGE RATES

The District Council reserves the right to establish wages and/or fringe benefit contributions that are different than those contained in this Agreement for the then current term, for the purpose of organizing, maintaining and/or recapturing work opportunities. The Union, for the purposes listed above, can change the terms and conditions of this Agreement as it sees fit at their sole and absolute discretion. All contractors shall be notified of any changes and/or concessions.

# ARTICLE XV

## EMPLOYER CONTRIBUTIONS AND PAYROLL DEDUCTIONS

**SECTION 1.** *Apprenticeship and Training Funds:*

The Employers and the Union hereby establish/maintain an Apprenticeship and Training Fund to be known as the "District Council 11 JAT Fund", (hereinafter referred to as the Apprenticeship and Training Fund) under a Trust Agreement attached hereto as Exhibit A and made part hereof.

**SECTION 1(a)**    Commencing with the first day of June 2005, and for the duration of this Agreement, and any renewals or extensions thereof, the Employer, as defined in the Agreement and Declaration of Trust executed by and between the International Union of Painters and Allied Trades, District Council 11, agrees to make payments to the District Council 11 JAT Fund for each Employee covered by this Agreement, as follows:

**SECTION 1(b)**    For each hour or portion of an hour for which an employee receives pay, the Employer shall make a contribution in the amount specified in Article XI of this Agreement to the above-named Apprenticeship and Training Fund.

**SECTION 1(c)**    Contributions shall be paid on behalf of any employee starting with the employee's first hour of employment in a job classification covered by this Agreement. This includes, but is not limited to apprentices and journeypersons.

**SECTION 1(d)**    The payments to the Apprenticeship and Training Fund required above shall be made to the District Council 11 JAT Fund which was established under an Agreement and Declaration of Trust, dated March 24, 1993. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as though he had actually signed the same. Contributions shall be made by the 20th of the month following the month in which the work was performed.

**SECTION 1(e)**    From the funds collected in the above manner, the Trustees of the District Council 11 JAT Fund shall hold in trust the sum of five cents ($.05) per hour for each hour or portion of an hour for which an employee receives pay, and remit said sum to the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT-JATF) at such regular periods of time and in the manner and form as shall be determined by the Trustees of the International Fund.

**SECTION 1(f)**    The payments to the International Fund required in above Section 1(e) shall be made to the IUPAT-JATF, which was established under an Agreement and Declaration of Trust dated May 1, 1995. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as though he has actually signed the same.

**SECTION 2(a)**    The Employer hereby irrevocably designates as its representatives on the Board of Trustees of the IUPAT-JATF such Trustees as are now serving, or who will in the future serve,

14

as Employer Trustees, together with their successors, as provided for in the aforesaid Trust Indenture.

**SECTION 2(b)**    The Union hereby irrevocably designates as its representatives on the Board of Trustees of the IUPAT-JATF such Trustees as are now serving, or who will in the future serve, as Union Trustees, together with their successors, as provided for in the aforesaid Trust Indenture.

**SECTION 2(c)**    The parties hereto further agree to be bound by all actions taken by the Trustees of the IUPAT-JATF pursuant to the said Agreement and Declaration of Trust.

**SECTION 3.**  All contributions shall be made at such time and in such manner as the Trustees require; and the Trustees shall have the authority to have a Certified Public Accountant audit the payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the Apprenticeship Fund.

**SECTION 4.**  If an Employer fails to make contributions to the District Council 11 JAT Fund within twenty (20) days after the date required by the Trustees, such failure shall be deemed a violation of this Agreement, and the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs for collecting the payment due together with attorney's fees and such penalties as may be assessed by the Trustees.  The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause which may be provided or set forth elsewhere in this Agreement.

**SECTION 5.**  The Apprenticeship Plan adopted by the Trustees of said Apprenticeship Funds shall at all times conform with the requirements of the Internal Revenue Code and other applicable laws and regulations so as to enable the Employer at all times to treat contributions to the Apprenticeship Fund as a deduction for income tax purposes.

**SECTION 6.**   ***STAR Program Fund***

1(a).    Commencing with the 1st day of June, 2005, and for the duration of this Agreement, and any renewals or extension thereof, the Employer agrees to make payments to the STAR Program Fund for each employee covered by this Agreement as follows:

1(b).    For each hour or portion thereof for which an employee receives pay, the Employer shall make a contribution as specified in Article XI, to the above-named Fund.

1(c).    For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

1(d).    Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement.  This includes, but is not limited to, apprentices and journeypersons.

1(e).    The payments to the STAR Program Fund required above shall be made to the local Administrator.  The Employer hereby agrees to be bound by and to the Agreement and Declaration of Trust, as amended from time to time, as though he had actually signed the same.  Contributions shall be made by the 20th of the month following the month in which the work was performed.

**SECTION 7. *International Union of Painters and Allied Trades Union and Industry Pension Fund:***  The only agreement between the Employer(s) and the Union regarding pensions or retirement for Employment covered by this Agreement is as follows:

1(a).    Commencing with the 1st day of June, 2005, and for the duration of this Agreement, and any renewals or extension thereof, the Employer agrees to make payments to the PAT International Union and Industry Pension Fund for each employee covered by this Agreement as follows:

1(b).    For each hour or portion thereof for which an employee receives pay, the Employer shall make a contribution as specified in Article XI, to the above-named Pension Fund.

1(c).    For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

1(d).    Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement.  This includes, but is not limited to, apprentices and journeypersons.

1(e).    The payments to the Pension Fund required above shall be made to the PAT International Union and Industry Pension Fund, which was established under an Agreement and Declaration of Trust, dated April 1, 1967.  The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as amended from time to time, as though he had actually signed the same.  Contributions shall be made by the 20th of the month following the month in which the work was performed.

2.    The Employer hereby irrevocably designates as its representative on the Board of Trustees such Trustees as are now serving, or who will in the future serve as Employer Trustees, together with their successors.  The Employer further agrees to be bound by all actions taken by the Trustees pursuant to the said Agreement and Declaration of Trust, as amended from time to time.

3.    The Trustees may at any time conduct an audit in accordance with Article V, Section 6 of the said Agreement and Declaration of Trust.

4.    If an Employer fails to make contributions to the Pension Fund within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due,

together with attorneys' fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided or set forth elsewhere in this Agreement.

5.    The Pension Plan and Annuity Plan adopted by the Trustees shall at all times conform with the requirements of the Internal Revenue Code so as to enable the Employer at all times to treat contributions to the PAT International Union and Industry Pension Fund as a deduction for income tax purposes.

**SECTION 8.**
*The Painters and Allied Trades Union Labor-Management Cooperation Fund.*

1 (a)    Commencing with the 1st day of June, 2005, and for the duration of this Agreement, and any renewals or extension thereof, the Employer agrees to make payments to the Painters and Allied Trades Labor-Management Cooperation Fund ("Fund") for each Employee covered by this Agreement as follows:

1 (b)    For each hour or portion of an hour for which an employee receives pay, the Employer shall make a contribution of five cents ($.05) to the Fund.

1 (c) For the purpose of this Article and wherever similar language is used in this Agreement, each hour paid for, including hours attributable to show-up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

1 (d) Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, apprentices and journeypersons.

2 (a)    The Employer and Union signatory to this Agreement agree to be bound by and to the Agreement and Declaration of Trust, as amended from time to time, establishing the Fund.

2 (b)    The Employer hereby irrevocably designates as its representatives on the Board of Trustees such Trustees as are now serving, or who will in the future serve as Employer Trustees, together with their successors.

2(c)    The Union hereby irrevocably designates as its representatives on the Board of Trustees such Trustees as are now serving, or who will in the future serve as Union Trustees, together with their successors.

3.    Contributions shall be made by the 20th of the month following the month in which the work was performed. The Trustees may at any time conduct an audit in accordance with the Agreement and Declaration of Trust.

4.      If an Employer fails to make contributions to the Fund within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due, together with attorneys' fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided or set forth elsewhere in this Agreement.

5.      Commencing with the first day of June, 2008, and for the duration of this Agreement, and any renewals or extensions thereof, the Employer agrees to make payments to the District Council 11 Labor Management Cooperation Trust local Fund in accordance with Article XI.

## SECTION 9.
### *Check-off:*
### *Administrative Dues, Political Action Together and Foundation For Fair Contracting*

1.      Every Employer signatory to this Agreement hereby agrees to deduct the appropriate dues checkoff as specified in the District Council 11 Bylaws from any employee employed by such Employer during the term of this Agreement.

1 (a)   The Union will notify the Employer in writing of the amount of Administrative Dues specified in the Bylaws, and will submit to the Employer a copy of the Bylaws or the applicable Bylaw provision.

1 (b)   For each payroll period, the Employer will deduct from the wages of each employee the amount specified in the Bylaws based on the number of hours worked during said payroll period, and will accumulate said deductions to the end of the month.

1 (c)   On or before the twentieth (20th) day of each month, the Employer will remit to the Union the entire amount of Administrative Dues due and owing as to each employee for the month previous, together with a list of employees covered hereby and the number of hours worked by each during the applicable period.

2 (a)   When a signatory Employer performs a job within the jurisdiction of a Union affiliated with the IUPAT other than the Union signatory hereto and the Bylaws of that other Union contain a provision for Administrative Dues, or Business Representative/Business Manager "assessment", the Employer shall check-off from the wages of employees covered by this Agreement and employed on the job Administrative Dues, or Business Representative/Business Manager "assessment", in the amount stated in that other Union's Bylaws and shall remit said amount to that other Union. In that event, the other Union shall be acting as agent of the signatory Union for the purpose of policing and administering this Agreement. In performing the check-off, the procedure specified in Section 9.1(a-c) will be followed, except that it shall be the responsibility of said other Union to notify the Employer in writing of the amount of Administrative Dues or Business Representative/Business Manager "assessment", specified in its Bylaws, and to submit to

18

the Employer a copy of the Bylaws for the applicable Bylaw provision. When the signatory Employer performs a job within the jurisdiction of a Union affiliated with the IUPAT other than the Union signatory hereto, and the Bylaws of that other Union contain no provision for administrative dues, the Employer shall continue to be bound by Section 9.1.

2 (b)     Every Employer signatory to this Agreement hereby agrees to check-off any employee employed by such Employer during the term of this Agreement Political Action Together and Foundation For Fair Contracting contributions in the amounts specified in this Agreement. Employers shall remit said amounts to the Union following the procedure set forth above in Section 9.1(a-c) for the remittance of Administrative Dues.

3.     Employees Covered: The obligations of the Employer under **Section 1** and **Section 2** of this Article shall apply only as to employees who have voluntarily signed a valid dues deduction authorization card.

4.     Authorization Card: At the time of employment of any employee, the Employer will submit to each such employee for his voluntary signature an agency fee or a dues deduction authorization card in duplicate, one copy of which is retained by the Employer and the other returned to the Union with their next Funds remittance report, the form to be supplied such Employer by the Union.

5.     Monthly List: On or before the twentieth (20th) day of each month, the Employer will submit to the Union a list of all employees covered by the Agreement who have not signed a dues deduction and/or agency fee authorization card, together with the number of hours worked by such Employee during the month previous.

The Union and/or Trust Funds may at any time conduct an audit of the Employer's records to insure proper payments have been made. Failure to pay contributions in a timely manner may subject a contractor to post a "fringe benefit bond" in accordance with the Audit, Collection and Delinquency Policy of the International Union of Painters and Allied Trades District Council 11 Health Fund.

Every new employer and/or out-of-area employer party to this Agreement shall post a Surety Bond with District Council 11 to cover payments on behalf of District Council 11 members. Such Surety Bond shall be in an amount determined by District Council 11. Until the Surety Bond is posted, a minimum Five Thousand Dollar ($5,000.$^{00}$) cash bond shall be held by District Council 11 for each employee.

Collections for Health, Pension and Annuity, Apprenticeship, STAR Program, Dues Check-off, Labor Management Cooperation Fund, Political Action Together, Foundation For Fair Contracting and any other such negotiated contributions are to be submitted on one form and sent to the Administrators in two checks. Completed forms and payments are due not later than twenty (20) days after the month covered by the report. The Administrators shall be Central Collections for the International and Insurance Programmers, Inc. for all local Funds.

If payment is not received, the Union will have the right to notify its members that said Contractor is in violation of this Agreement, and the Union can prevent its members from working for any delinquent Contractor, provided such Contractor is delinquent for a minimum of sixty (60) days.

The Employer's liability for payment under this Article shall not be subjected to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided or set forth elsewhere in this Agreement. The Employer agrees that the Union or Trustees shall be able to get an injunction to obtain immediate payment of the above money.

All Funds set forth in this Agreement shall at all times conform with the requirements of the Internal Revenue Code so as to enable the Employer at all times to treat contributions to said Funds as a deduction for income tax purposes.

Employers found to be delinquent in remittals required by this Article shall be liable for all costs incurred by the Union and/or Trust Funds in securing compliance including court, audit, and attorney's fees.

**SECTION 10.** *District Council 11 Health & Welfare Fund (see also Addendums I & II)*

*Local Union No. 195 Health & Welfare Fund (see also Addendum III)*

1 (a)    For each hour or portion of an hour for which an employee receives pay, the Employer shall make a contribution in accordance with Article XI and/or Addendum I, II, or III.

1 (b) For the purpose of this Article and wherever similar language is used in this Agreement, each hour paid for, including hours attributable to show up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

2.    Contributions shall be made by the 20th of the month following the month in which the work was performed. The Trustees may at any time conduct an audit in accordance with the appropriate Agreements and Declarations of Trust.

3.    If an Employer fails to make contributions to the appropriate Fund within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due, together with attorneys' fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided or set forth elsewhere in this Agreement.

# ARTICLE XVI

## UNION REPRESENTATION

**SECTION 1.**  Any District Council 11 Representative shall have the right to visit all jobs and shops for the purpose of ascertaining whether the provisions of this Agreement are being carried out.

**SECTION 2.** Job Stewards:

1. When it is for the best interest of District Council 11, the District Council reserves the right to place a Steward on any and all jobs within the jurisdiction of the District Council. If and when a Steward is placed on a job with a local contractor, the Steward will be selected from that contractor's regular workforce if at all possible.

2. Stewards shall report all overtime on regular work days within twenty-four (24) hours to the District Council 11 office as to the number of employees and hours worked. Stewards shall also make this report at the first regular meeting.

3. All employees shall show their work cards/dues receipts to the Steward on the job, and shall support the Steward in the performance of their duties. Employees shall also upon request by a District Council Representative produce any and all pay stubs.

4. The Job Steward shall report all accidents to the Employer and the District Council office.

5. No Job Steward shall act in any supervisory capacity.

6. Any member who acts as Job Steward in accordance with the appointment and loses employment through the performance of Union-related duties as such, shall report the matter to the Business Manager/Secretary Treasurer, and an investigation of same shall be made by the District Council. Upon proof being secured that said Job Steward had been discriminated against, owing to the faithful work for the District Council, all employees at work in such shops shall be withdrawn until satisfactory adjustment has been reached, any provision to the contrary notwithstanding.

7. Job Stewards shall be allowed a reasonable time, whenever necessary, for the policing of job or conditions. Said activities will be performed in conjunction with the Foreman on the job. In no event shall a Job Steward be discharged, laid off, or transferred to another job until both the Employer and the District Council have had an opportunity to investigate the charge against the Steward. The Steward shall be the last employee on the job, exclusive of Foreman.

8. Whenever there is overtime on a job, the Steward shall be part of the workforce.

# ARTICLE XVII

## INSURANCE

Each Employer agrees to carry Workers' Compensation, Liability Insurance, and Unemployment Compensation Insurance.

# ARTICLE XVIII

## SAFETY

**SECTION 1.** In accordance with the requirement of the Occupational Safety and Health Act of 1970, it shall be the exclusive responsibility of the Employer to ensure the safety of its employees and compliance by them with any safety rules contained herein or established by the Employer. Nothing in this Agreement will make the Union liable to any employees or to any other persons in the event that work-related disease, sickness, death, injury, or accident occurs.

**SECTION 2.** The Employer will not engage in any litigation against the Union on a subrogation theory, contribution theory, or otherwise, so as to obtain a money judgment from it in connection with any work-related disease, sickness, death, injury, or accident.

**SECTION 3.** If any judgment of liability is entered against the Union in connection with work-related disease, sickness, death, injury, or accident, the Employer agrees to indemnify the Union to the full extent of such liability, as well as any costs and attorney's fees awarded against or incurred by the Union in such litigation.

**SECTION 4.** The Employer shall, at all times, provide safe tools, materials and equipment and safe working conditions. If at any time, in the opinion of an employee, such tools, materials, or equipment or working conditions are unsafe and constitute a hazard to health or physical safety, the employee shall have the right to refuse to work with such tools, materials and equipment or under such hazardous conditions unless or until they are made safe. No employee shall be dismissed, disciplined, or otherwise discriminated against, nor shall his pay be withheld, for refusal to work with such unsafe tools, materials, or equipment or under such unsafe or hazardous working conditions.

**SECTION 5.** The Employer agrees that during the life of this Agreement, the Employer will comply with all applicable Federal and State laws concerning Occupational Safety and Health, including all applicable standards, rules and regulations issued pursuant thereto.

**SECTION 6.** The Employer shall provide, at no cost to the employee, all necessary personal protective equipment and instructions on proper use of such equipment. The Employer shall provide for the proper maintenance and cleaning of all necessary personal protective equipment. If at any time, in the opinion of an employee, such personal protective equipment is defective, has not been properly maintained, or is not the appropriate personal protective equipment under the particular working conditions, the employee has the right to refuse to work with such equipment. No employee shall be dismissed, disciplined, or otherwise discriminated against, nor shall his pay

22

be withheld for refusal to work with such defective, improperly maintained, inappropriate personal protective equipment. The employee shall immediately report to the Employer such defective, improperly maintained, or inappropriate personal protective equipment.

**SECTION 7.** The Employer shall notify the Union sixty (60) days in advance of any changes in conditions of employment that may affect the health and safety of employees.

**SECTION 8.** Except as clearly and specifically required by law or regulation, the Employer shall not require any employee to sign a form or statement dealing with health and safety, hazards in the workplace, or instruction and training relating to hazards in the workplace, unless that form or statement has been negotiated with and agreed upon by the Union.

# ARTICLE XIX

## NO SUBCONTRACTING CLAUSE

The Employer will not contract out, subcontract or outsource any jobsite work covered by this Agreement to any subcontractor or other person unless that subcontractor or other person is a party to a collective bargaining agreement which incorporates wages, hours and working conditions which are the equivalent of those specified in this agreement or the existing collective bargaining agreement of any affiliate of the IUPAT which is applicable in the area where the work or the job is to be performed, whichever is the most favorable to the employees of the said subcontractor or other person. This will apply in all instances except where such subcontractor or other person is not available.

# ARTICLE XX

## PRESERVATION OF WORK

**SECTION 1.** To protect and preserve, for the employees covered by this Agreement, all work they have performed and all work covered by this Agreement, and to prevent any device or subterfuge to avoid the protection and preservation of such work, it is agreed as follows: If the Employer performs on-site construction work of the type covered by this Agreement, under its own name or the name of another, as a corporation, company, partnership, or other business entity, including a joint venture, wherein the Employer, through its officers, directors, partners, owners, or stockholders, exercises directly or indirectly (through family members or otherwise) management, control, or majority ownership, the terms and conditions of this Agreement shall be applicable to all such work.

**SECTION 2.** All charges of violations of Section 1 of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement on the handling of grievances and the final and binding resolution of disputes. As a remedy for violations of this Article, the Joint Trade Board or Arbitrator shall be able, at the request of the Union, to require an

23

Employer to pay (1) to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages those employees have lost because of the violations, and (2) into the affected Joint Trust Funds to which this Agreement requires contributions, any delinquent contributions that resulted from the violations. The Joint Trade Board or Arbitrator shall be able also to provide any other appropriate remedies, whether provided by law or this Agreement. The Union shall enforce a decision of the Joint Trade Board or Arbitrator under this Article only through arbitral, judicial, or governmental (for example, the National Labor Relations Board) channels.

**SECTION 3.** If, after an Employer has violated this Article, the Union and/or the Trustees of one or more Joint Trust Funds to which this Agreement requires contributions institute legal action to enforce an award by an Arbitrator or the Joint Trade Board remedying such violation, or defend an action that seeks to vacate such award, the Employer shall pay any accountants' and/or attorneys' fees incurred by the Union and/or the Joint Trust Funds, plus costs of litigation, that have resulted from such legal action. This Section does not affect other remedies, whether provided by law or this Agreement, that may be available to the Union and/or the Joint Trust Funds.

# ARTICLE XXI

## FUNCTION OF MANAGEMENT

In the exercise of its functions of management, the Employer shall have the right to plan, direct and control operations of all its work, hire employees, direct the working forces in the field, assign employees to their jobs, discharge, suspend or discipline for proper cause (proper cause for discharge includes but is not necessarily limited to incompetence, insubordination, habitual tardiness or absenteeism), transfer, promote or demote employees, lay off employees because of lack of work, or for other legitimate reasons, require employees to observe the Employers and/or contracting entities' rules and regulations not inconsistent with this Agreement, institute a fair and consistent drug policy, regulate the amount of equipment used and the use of equipment and other property of the Employer, decide the number of employees needed; provided, however, that the Employer will not use its rights for the purpose of discrimination against any employee.

# ARTICLE XXII

## GRIEVANCE PROCEDURE

**SECTION 1.** The parties shall establish and maintain a Joint Trade Board both in Rhode Island and Connecticut, composed of six members, three appointed by the Union and three appointed by the Employers. Four members, two appointed by each party, shall constitute a quorum. Decisions shall be made by a majority vote, provided that Union appointees and Employer appointees shall have equal voting strength with respect to such vote. Members of the Joint Trade Board shall choose a Chairman and Secretary to serve such terms as may be agreed upon by the Board, provided that one such officer shall be a Union appointee and one an Employer appointee.

**SECTION 2.** The Joint Trade Board is empowered to hear and decide all grievances and disputes which arise between the parties as to the interpretation or application of this Agreement; to award or assess remedies, damages and penalties for violations of this Agreement; to issue interpretative rulings or other rules and regulations as it deems necessary to give force and effect to the purpose and intent of this Agreement; to investigate all grievances and disputes submitted to it, including the conduct of audits of Employer records; to recommend amendments to or committees as may be necessary to aid the Board in the performance of its duties; and to demand of Employers who repeatedly violate this Agreement the posting of a cash or surety bond to assure future compliance.

**SECTION 3.** All grievances and disputes shall be submitted to the Secretary in written form, with copy furnished to the opposing party.

**SECTION 4.** The Joint Trade Board shall meet whenever necessary. Special meetings may be called by the Chairman or Secretary when a prompt hearing and decision is required in any given dispute.

**SECTION 5.** No Union Representative shall sit as a Board member in any case involving himself or herself or his or her Employer, directly or indirectly; and no Employer representative shall sit as a Board member in any case involving himself or herself or any of his or her employees, directly or indirectly.

**SECTION 6.** Decisions, awards, or orders of the Board shall be final and binding.

**SECTION 7.** The Board shall maintain full and complete records and minutes of its proceedings, which records and minutes may be inspected at reasonable times by the parties to this Agreement.

**SECTION 8.** Finances of the Joint Trade Board shall be derived from fees, assessments, fines, or levies, other than actual damages, which may be imposed by the Board.

**SECTION 9.** If the Joint Trade Board deadlocks or otherwise fails to decide any grievance or dispute, either party may, within 30 days following said deadlock or failure, refer the grievance or dispute to arbitration by filing a written request with the Secretary of the Board, with copy served on the opposing party. On receipt of such notice, the Joint Trade Board shall choose an arbitrator. If the Board cannot agree on an arbitrator, it shall promptly request a list of arbitrators from the Federal Mediation and Conciliation Service (FMCS) or the American Arbitration Association (AAA). On receipt of such a list, the Chairman and Secretary of the Board shall select an arbitrator from such list in accordance with the rules and regulations of the FMCS or AAA. The decision of the arbitrator shall be final and binding.

**SECTION 10.**    With respect to any individual Employer that fails to comply with a final and binding decision issued at any level of this grievance procedure, the Union may, in its discretion: (a) terminate this Agreement by 48 hours written notice to such Employer; or (b) continue this Agreement in effect but not be bound or restricted by any "no strike" clause or similar obligation hereunder and/or (c) resort to any legal recourse available to it, including a job action or strike.

**SECTION 11.**    There shall be no strike or lockout on any job over any grievance or dispute while it is being processed through this grievance procedure and until the said procedure has been exhausted.  However, and notwithstanding any contrary provision of this Agreement, the Union may remove employees from any job(s) of an individual Employer who fails or refuses to pay the wages and fringe benefits, or to meet the schedule of hours, provided for and required by this Agreement, or refuses to stand trial under these procedures, or fails to comply with a final and binding decision issued at any level of this grievance procedure.  When the Union removes employees from the job pursuant to this Section, the individual Employer involved shall pay all employees so removed an amount equal to one (1) day's pay at the employee's regular straight time rate for the inconvenience and time-loss occasioned by his conduct. Nothing stated in this Section shall preclude the Employer from resorting to the grievance procedure with respect to any action of sanction taken or imposed by the Union hereunder.

**SECTION 12.**    Notwithstanding Sections 10 and 11, a final and binding decision rendered as part of the grievance procedure regarding the subcontracting clause of this Agreement shall be enforced solely through administrative or judicial proceedings.

**SECTION 13.**    The remedies and sanctions specified in Section 10 and 11 are in addition to other remedies and sanctions that may be permitted by other provisions of this Agreement or by operation of law.

## ARTICLE XXIII

## GENERAL SAVINGS CLAUSE

If any Article or Section of this Agreement should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of an Article or Section should be restrained by such tribunal pending a final determination as to its validity, the remainder of this Agreement or the application of such Article or Section to persons or circumstances other than those as to which it has been held invalid or as to which compliance with or enforcement of has been restrained, shall not be affected thereby.

In the event that any Article or Section is held invalid or enforcement of or compliance with any Article or Section has been restrained, as above set forth, the affected parties shall meet at the request of the Union, for the purpose of arriving at a mutually satisfactory replacement for such Article or Section during the period of invalidity or restraint.  If the parties do not agree on a mutually satisfactory replacement within sixty (60) days after beginning of the period of invalidity or restraint, either party shall be permitted all legal or economic recourse in support of its demands notwithstanding any provision in this Agreement to the contrary.

# ARTICLE XXIV

## DURATION CLAUSE

**SECTION 1.** This Agreement shall be in full force and effect from June 1, 2005 to and including May 31, 2009, and shall continue from year to year thereafter unless written notice of desire to cancel or terminate the Agreement is served by either party upon the other not less than sixty (60) days and not more than ninety (90) days prior to any subsequent contract year.

**SECTION 2.** Where no such cancellation or termination notice is served and the parties desire to continue said Agreement, but also desire to negotiate changes or revisions in this Agreement, either party may serve upon the other a written notice not less than sixty (60) days and not more than ninety (90) days prior to any subsequent contract year, advising that such party desires to revise or change terms or conditions of such Agreement. The respective parties shall be permitted all legal or economic recourse to support their requests for revisions if the parties fail to agree thereon. Nothing herein shall preclude the parties from making revisions or changes in this Agreement, by mutual consent, at any time during its term.

# DISTRICT COUNCIL 11

# ACCEPTANCE OF AGREEMENT

This Agreement shall be effective from *June 1, 2005* to *May 31, 2009.*


_____

**Dominick J. Cieri, Business Manager**
**DISTRICT COUNCIL 11**

The undersigned, _____, hereby accepts and agrees to be bound by the foregoing Agreement as an Agreement between myself and/or the Company for which I am duly authorized to act, and the Union, covering the employment of employees represented by the Union. In consideration thereof, the Union agrees to accept me and/or the Company as an employer under the terms of the Agreement.

The undersigned has read and hereby approves and adopts the foregoing Agreement in its entirety.

Company Name:_____

Business Address:_____

_____

Telephone No.:_____ Fax No.:_____

Email Address:_____

Date:  _____

Printed Name of
Authorized Representative:_____

Title:_____


Signature:_____

28

# ADDENDUM I

# GLAZIERS

## WAGE RATES

***EFFECTIVE DATES***:          **JUNE 1, 2005 – MAY 31, 2009**

The following are the wage rates for the above effective dates applicable for the entire jurisdiction of District Council 11.

**All Foremen** shall be paid $2.00 more than the applicable journeyman rate.  Foremen will receive a forty (40) hour guarantee, rain or shine, when working with a composite crew and the other trade has that particular benefit in their contract.

**1.  JOURNEYMAN GLAZIER**

| ***EFFECTIVE DATE*** | 6/1/2005 | 6/1/2006 | 6/1/2007 | 6/1/2008 |
|---|---|---|---|---|
| | $28.38 | $29.38 | $30.38 | $31.43 |

**2.      SWINGSTAGE**

| ***EFFECTIVE DATE*** | 6/1/2005 | 6/1/2006 | 6/1/2007 | 6/1/2008 |
|---|---|---|---|---|
| | $29.38 | $30.38 | $31.38 | $32.43 |

**3.      FOREMEN**

| ***EFFECTIVE DATE*** | 6/1/2005 | 6/1/2006 | 6/1/2007 | 6/1/2008 |
|---|---|---|---|---|
| | $30.38 | $31.38 | $32.38 | $33.43 |

**SUNDAYS:**  All work performed on Sundays shall be paid for at the rate of double time.

**SECOND SHIFT:**  The second shift shall be worked between the hours of 3:30/5:00PM and 12:00/1:30AM, and all employees shall be paid $2.00 per hour more than the applicable pay rate.

**THIRD SHIFT:**  The third shift shall be worked between the hours of 10:00PM/12:00 midnight and 6:30/8:30AM, and all employees shall be paid $3.00 per hour more than the applicable pay rate.

**COFFEE BREAK:** There shall be a ten (10) minute coffee break allowed on all shifts.

**HOLIDAYS**   The following Holidays shall be observed on either the day of the Holiday or the day celebrated as such:

New Year's Day, Good Friday, Memorial Day, July 4th, Labor Day, Thanksgiving Day, and Christmas Day, VJ Day (*if working in Rhode Island*), Patriots Day (*if working in Massachusetts*). Labor Day and Christmas Day are paid Holidays.

**APPRENTICE RATES** - The rate of wages for apprentices shall be the following percentages of the journeymen wage rates:

| | | | |
|---|---|---|---|
| First | 1,000 hours – 50% | Fifth | 1,000 hours – 75% |
| Second | 1,000 hours – 56.25% | Sixth | 1,000 hours – 81.25% |
| Third | 1,000 hours – 62.50% | Seventh | 1,000 hours – 87.50% |
| Fourth | 1,000 hours – 68.75% | Eighth | 1,000 hours – 93.75% |

## PENSION AND ANNUITY FUND CONTRIBUTIONS

**Refer to Working Agreement, Article X, Section 1 for contribution amounts.**

## DISTRICT COUNCIL 11 HEALTH & WELFARE FUND

**SECTION 1.**   The parties hereto jointly agree to maintain the Health & Welfare Fund (now known as District Council 11 Health Fund) for the benefit of the employees in accordance with the written Agreement and Declaration of Trust made August 1, 1992, as the same may be from time to time amended.  The Agreement and Declaration of Trust of the above-named Fund is incorporated and made a part of this Working Agreement and related Addendums.  The Employer hereby agrees to be bound by the Agreement and Declaration of Trust.  Contributions to the Fund shall be made by the 20th of the month following the month in which the work was performed.

**SECTION 2.**   Each employer agrees to pay into the District Council 11 Health Fund the sum as provided in Article XI of the Working Agreement and/or the appropriate Addendum for each hour paid for, including hours attributable to show up time, for each employee covered by this Agreement.  Contributions shall commence with the employee's first day of employment and shall be made on behalf of all employees working under the terms and conditions of this Working Agreement.

2

## TRADE RULES AND WORKING CONDITIONS

**SECTION 1.**  Neither the Union nor the Employer shall discriminate against any employee or applicant because of race, color, creed, sex, national origin, or union or non-union status.

**SECTION 2.**  Each journeyperson and apprentice in the Glass and Glazing Trades shall furnish tool box, combination square, glass pliers and offset breakers, wood, metal and coal chisels, claw and plastic hammers, snips straight, right and left, screwdrivers (assorted), nail sets, crescent wrench, yankee screwdriver and bits, pliers (assorted), hacksaw, chalk line, dividers, allen wrench set, files (assorted), wrenches (assorted), socket wrench set (assorted), all other tools necessary to perform the work of the trade will be provided by the Employer.

**SECTION 3.**  It is agreed that the Employer shall not lay off or discharge an employee because of any Union activity or because of any complaints to the Union against the Employer.

**SECTION 4.**  The Union will not allow any member to contract work that would normally be done by contractors signatory to the District Council 11 Working Agreement at any time.

**SECTION 5.**  All workers shall be allowed five (5) minutes wash-up before Lunch and quitting time and furnished with clean water, soap, and towels; also, fresh drinking water in sanitary water container with paper cups.

**SECTION 6.**  Where feasible, the Employer agrees to provide a dressing room for all employees' use in storing street clothes and tools.  Same to be provided with lock and key to be in the charge of Foreman and/or Job Steward.

**SECTION 7.**  The Employer agrees to furnish adequate and safe scaffolding, ladders, and other equipment necessary for the proper performance of the work.

**SECTION 8.**  Employees shall not be transported or transferred of their own accord from job to job during lunch period.

**SECTION 9.**  The Employer shall deliver all materials and equipment to the job.  No employees shall be made to transport bulky or heavy materials or equipment in his car.

**SECTION 10.**     The Contractor agrees that no employee shall be required or permitted to work on a piece-rate in any manner unless otherwise spelled out in this Agreement.

**SECTION 11.**     When employees are sent out of town where they cannot return daily without undue hardship, the Contractor agrees to pay a minimum of $50.00 a day plus weekly round trip fare.  Expenses shall be actual.  If additional expenses must be incurred, approval must be secured from the Contractor prior to incurring said expenses.

**SECTION 12.**     Actual cost of parking in Providence only shall be paid upon submission of receipts.

3

## SECTION 13. RACK SCHEDULE

Door lt's up to and including 116 United Inches ¼ inch plate, one (1) man.

| | | 5/8 inch | 1 inch |
|---|---|---|---|
| Insulated Units…………………………………………… | | 5/8 inch | 1 inch |
| Polished Plate……………………………1/4 inch | | 3/8 inch | ½ inch |
| 116 to 170 U.I. requires… | 2 men | 3 men | 4 men |
| 171 to 190 U.I. | 3 men | 4 men | 5 men |
| 191 to 226 U.I. | 4 men | 5 men | 6 men |
| 227 to 240 U.I. | 5 men | 6 men | 7 men |
| 241 to 250 U.I. | 6 men | 7 men | 8 men |
| 251 to 260 U.I. | 7 men | 8 men | 9 men |
| 261 to 272 U.I. | 8 men | 9 men | 10 men |
| 273 to 284 U.I. | 9 men | 10 men | 11 men |
| 285 to 300 U.I. | 10 men | 11 men | 12 men |
| 301 to 312 U.I. | 11 men | 12 men | 14 men |

*U.I. = United Inches

It is further agreed that on larger glass or glass insulating units such as manufactured by L.O.F., P.P.G., or any other glass units of similar type, additional men shall be used.

Where a mechanical aid or vacuumation is used for the installation of glass, only the men required shall be used. There shall be no set schedule as there are many variations to job site conditions.  Therefore, the amount of men used for installation shall be decided by the Union and the Contractor involved.

# ADDENDUM II

# CONNECTICUT PAINTERS, PAPERHANGERS & TAPERS

## WAGE RATES

**EFFECTIVE DATES:**       **JUNE 1, 2005 – MAY 31, 2009**

The following are the wage rates for the above effective dates applicable for the entire State of Connecticut and Fisher's Island.

**All Foremen** shall receive 10% above the highest rate being paid in the crew.

## A.  PAINTER

1.     Brush & Roller rates are as follows:

| *EFFECTIVE DATE* | 6/1/2005 | 6/1/2006 | 6/1/2007 | 6/1/2008 |
|---|---|---|---|---|
| | $25.02 | $25.92 | $26.87 | $27.87 |

2.     Red Label Products, all epoxy materials, power tools, work in any radiological areas, also, interior working conditions in areas at heavy industrial defense, and utility plants with heat of 90 F and above requiring either use of a respirator and/or ear protection unless special clothing of type allowing for interior temperature control to be kept below 90 F is provided rates are as follows:

| *EFFECTIVE DATE* | 6/1/2005 | 6/1/2006 | 6/1/2007 | 6/1/2008 |
|---|---|---|---|---|
| | $25.52 | $26.42 | $27.37 | $28.37 |

3.     Material Blast and Spray rates are as follows:

| *EFFECTIVE DATE* | 6/1/2005 | 6/1/2006 | 6/1/2007 | 6/1/2008 |
|---|---|---|---|---|
| | $28.02 | $28.92 | $29.87 | $30.87 |

4.     Material Blast and Spray Helper rates are as follows:

| *EFFECTIVE DATE* | 6/1/2005 | 6/1/2006 | 6/1/2007 | 6/1/2008 |
|---|---|---|---|---|
| | $26.02 | $26.92 | $27.87 | $28.87 |

5.    Tanks, towers, swingstage, boatswain chair, riding steel, all tanks, pipes and vessels inside, and hazardous work of similar character rates are as follows:

| *EFFECTIVE DATE* | 6/1/2005 | 6/1/2006 | 6/1/2007 | 6/1/2008 |
|------------------|----------|----------|----------|----------|
|                  | $27.02   | $27.92   | $28.87   | $29.87   |

## B.  PAPERHANGER

The following are the hourly rates for Paperhangers.  Piecework rates are contained in Appendix A of this Addendum.

| *EFFECTIVE DATE* | 6/1/2005 | 6/1/2006 | 6/1/2007 | 6/1/2008 |
|------------------|----------|----------|----------|----------|
|                  | $25.52   | $26.42   | $27.37   | $28.37   |

## C.  TAPER

| *EFFECTIVE DATE* | 6/1/2005 | 6/1/2006 | 6/1/2007 | 6/1/2008 |
|------------------|----------|----------|----------|----------|
|                  | $25.77   | $26.67   | $27.62   | $28.62   |

*For Painters only*, Saturday may be used as a voluntary make up day at straight time rates when time is lost during the regular work week due to inclement weather.

**SUNDAYS:**  All work performed on Sundays shall be paid at the rate of one and one-half times the regular rate.

**SECOND SHIFT:**  The second shift shall be worked between the hours of 3:30/5:00PM and 12:00/1:30AM, and all employees shall be paid $2.00 per hour more than the applicable pay rate.

**THIRD SHIFT:**  The third shift shall be worked between the hours of 10:00PM/12:00 midnight and 6:30/8:30AM, and all employees shall be paid $3.00 per hour more than the applicable pay rate.

**COFFEE BREAK:**  There shall be a ten (10) minute coffee break allowed on all shifts.

**HOLIDAYS**   The following Holidays shall be observed on either the day of the Holiday or the day celebrated as such:

New Year's Day, Good Friday, Memorial Day, July 4th, Labor Day, Thanksgiving Day and Christmas Day.

2

**APPRENTICE RATES** - The rate of wages for apprentices shall be the following percentages of the journeymen wage rates:

| | | | | |
|---|---|---|---|---|
| First | 1,000 hours – 50% | | Fourth | 1,000 hours – 65% |
| Second | 1,000 hours – 55% | | Fifth | 1,000 hours – 70% |
| Third | 1,000 hours – 60% | | Sixth | 1,000 hours – 75% |

## PENSION AND ANNUITY FUND CONTRIBUTIONS

**Refer to Working Agreement, Article X, Section 1, for contribution amounts, with the following exception:**

*Apprentices registered after June 1, 2005 shall have their Third Year benefits paid at the rate of $1.00 pension and $1.00 Annuity.*

## DISTRICT COUNCIL 11 HEALTH & WELFARE FUND

**SECTION 1.** The parties hereto jointly agree to maintain the Health & Welfare Fund (now known as District Council 11 Health Fund) for the benefit of the employees in accordance with the written Agreement and Declaration of Trust made August 1, 1992, as the same may be from time to time amended. The Agreement and Declaration of Trust of the above-named Fund is incorporated and made a part of this Working Agreement and related Addendums. The Employer hereby agrees to be bound by the Agreement and Declaration of Trust. Contributions to the Fund shall be made by the 20th of the month following the month in which the work was performed.

**SECTION 2.** Each employer agrees to pay into the District Council 11 Health Fund the sum as provided in Article XI of the Working Agreement and/or the appropriate Addendum for each hour paid for, including hours attributable to show up time, for each employee covered by this Agreement. Contributions shall commence with the employee's first day of employment and shall be made on behalf of all employees working under the terms and conditions of this Working Agreement.

## TRADE RULES AND WORKING CONDITIONS

**SECTION 1.** Neither the Union nor the Employer shall discriminate against any employee or applicant because of race, color, creed, sex, national origin, or union or non-union status.

**SECTION 2.** Each journeyperson and apprentice of the Painting Trades shall be required to furnish at least the following tools of the trade: wall knives, white overalls, putty knives, duster, hammer, screwdriver, pot hooks, work shoes, and steel toed work shoes if required by job site safety program. Paperhangers and Tapers shall likewise be required to provide such tools of the trade.

**SECTION 3.** It is agreed that the Employer shall not lay off or discharge an employee because of any Union activity or because of any complaints to the Union against the Employer.

**SECTION 4.** The Union will not allow any member to contract work that would normally be done by contractors signatory to the District Council 11 Working Agreement at any time.

**SECTION 5.** All workers shall be allowed five (5) minutes wash-up before Lunch and quitting time and furnished with clean water, soap, and towels; also, fresh drinking water in sanitary water container with paper cups. Spray persons and helpers shall be allowed reasonable time for personal clean-up.

**SECTION 6.** No employee shall be penalized or disciplined in any way for his refusal to work with Red Label/epoxy products.

**SECTION 7.** Any employee working with stilts shall adhere to all appropriate and applicable OSHA guidelines pertaining to safety. Job site must remain safe and clutter free at all times while wearing stilts.

**SECTION 8.** No employee shall be penalized or disciplined in any way for refusal to wear stilts.

**SECTION 9.** Where feasible, the Employer agrees to provide a dressing room for all employees' use in storing street clothes and tools. Same to be provided with lock and key to be in the charge of Foreman and/or Job Steward.

**SECTION 10.** The Employer agrees to furnish adequate and safe scaffolding, ladders, and other equipment necessary for the proper performance of the work.

**SECTION 11.** Employees shall not be transported or transferred of their own accord from job to job during lunch period.

**SECTION 12.** The Employer shall deliver all materials and equipment to the job. No employees shall be made to transport bulky or heavy materials or equipment in his car.

## ADDENDUM II

## CONNECTICUT PAINTERS, PAPERHANGERS & TAPERS

### APPENDIX A
### Paper Hangers Piece Work

A.    Fifty Four Inch Wide Goods (54")

| EFFECTIVE DATE | | 6/1/2005 | 6/1/2006 | 6/1/2007 | 6/1/2008 |
|---|---|---|---|---|---|
| 1. | Vinyl | $5.65 | $5.90 | $6.15 | $6.40 |
| 2. | Non Vinyl | $6.15 | $6.40 | $6.65 | $6.90 |

B.    Thirty Six Inch Wide Goods (36") *"all are per square foot prices"*

| EFFECTIVE DATE | 6/1/2005 | 6/1/2006 | 6/1/2007 | 6/1/2008 |
|---|---|---|---|---|
| All types and grades | $ 0.60 | $ 0.65 | $ 0.70 | $ 0.75 |

C.    Rolled Goods less than Thirty Six Inches Wide *"all are per single roll prices"*

| EFFECTIVE DATE | 6/1/2005 | 6/1/2006 | 6/1/2007 | 6/1/2008 |
|---|---|---|---|---|
| All types and grades | $20.00 | $21.00 | $22.00 | $23.00 |

D.    Borders *"all are per linear foot prices"*

| EFFECTIVE DATE | 6/1/2005 | 6/1/2006 | 6/1/2007 | 6/1/2008 |
|---|---|---|---|---|
| All types and grades | $ 0.80 | $ 0.85 | $ 0.90 | $ 0.95 |

# ADDENDUM III

# RHODE ISLAND PAINTERS, PAPERHANGERS & TAPERS

## WAGE RATES

**EFFECTIVE DATES:**          JUNE 1, 2005 – MAY 31, 2009

The following are the wage rates for the above effective dates applicable for the entire State of Rhode Island.

**All Foremen** shall receive $2.00 above the highest rate being paid in the crew.

## A.  PAINTER

1.      Brush, Roller, Paperhanger, Taper rates are as follows:

| EFFECTIVE DATE | 6/1/2005 | 1/1/2006 |
|---|---|---|
| | $23.87 | $24.67 |

2.      Spray, Sand, Water Blasting rates are as follows:

| EFFECTIVE DATE | 6/1/2005 | 1/1/2006 |
|---|---|---|
| | $24.87 | $25.67 |

3.      Application of Epoxy rates are as follows:

| EFFECTIVE DATE | 6/1/2005 | 1/1/2006 |
|---|---|---|
| | $25.87 | $26.67 |

4.      Tanks, towers, swingstage, boatswain chair, riding steel, all tanks, pipes, and vessels inside, and hazardous work of similar character rates are as follows:

| EFFECTIVE DATE | 6/1/2005 | 1/1/2006 |
|---|---|---|
| | $25.87 | $26.67 |

5.      Lead Abatement rates payable while inside containment during abrasive blasting, blow down, and clean up until containment is breached are as follows:

| EFFECTIVE DATE | 6/1/2005 | 1/1/2006 |
|---|---|---|
| | $25.87 | $26.67 |

## Future increases (allocation to be determined June 1st of each year)

| June 1, 2006 | Jan. 1, 2007 | June 1, 2007 | Jan. 1, 2008 | June 1, 2008 |
|:---:|:---:|:---:|:---:|:---:|
| $ .80 | $ .85 | $ .85 | $ .85 | $1.75 |

*For Painters only,* Saturday may be used as a voluntary make up day at straight time rates when time is lost during the regular work week due to inclement weather.

*Prevailing Wage Jobs* - On prevailing wage jobs, all wages and benefits published in the specifications shall prevail throughout the duration of the job (unless there are provisions for increases to be paid). Any employee refusing to work on prevailing rate jobs where the rates are less than the current contract rate and the employer has no other work, the employee will not be discriminated against and shall be laid off in a manner so as the employee may receive unemployment benefits.

**SUNDAYS:** All work performed on Sundays shall be paid for at the rate of double time.

**SECOND SHIFT:** The second shift shall be worked between the hours of 3:30/5:00PM and 12:00/1:30AM, and all employees shall be paid $2.00 per hour more than the applicable pay rate.

**THIRD SHIFT:** The third shift shall be worked between the hours of 10:00PM/12:00 midnight and 6:30/8:30AM, and all employees shall be paid $3.00 per hour more than the applicable pay rate.

*Shift rates will be paid only when there is a first or second shift worked prior to the start of the shift.*

**COFFEE BREAK:** There shall be a fifteen (15) minute coffee break allowed on all shifts.

**HOLIDAYS** The following Holidays shall be observed on either the day of the Holiday or the day celebrated as such:

New Year's Day, Good Friday, Memorial Day, July 4th, VJ Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day and Christmas Day.

**APPRENTICE RATES** - The rate of wages for apprentices shall be the following percentages of the journeymen wage rates:

| First | 1,000 hours – 50% | Fourth | 1,000 hours – 65% |
|---|---|---|---|
| Second | 1,000 hours – 55% | Fifth | 1,000 hours – 70% |
| Third | 1,000 hours – 60% | Sixth | 1,000 hours – 75% |

## PENSION AND ANNUITY FUND CONTRIBUTIONS

**Refer to Working Agreement, Article X, Section 1, for contribution amounts.**

**Effective 6/1/05, Painters Local 195 Annuity Fund contribution shall be $2.20 per hour**

## PAINTERS & ALLIED TRADES LOCAL UNION NO. 195 HEALTH & WELFARE FUND

| Effective Date | Hourly Rate |
|---|---|
| June 1, 2005 | $ 6.50 |

## PAINTERS & ALLIED TRADES LOCAL UNION NO. 195 HEALTH & WELFARE FUND

**SECTION 1.** The parties hereto jointly agree to maintain the Painters & Allied Trades Local Union No. 195 Health & Welfare Fund for the benefit of the employees in accordance with the written Agreement and Declaration of Trust, as the same may be from time to time amended. The Agreement and Declaration of Trust of the above-named fund is incorporated and made a part of this Working Agreement and related Addendums. The Employer hereby agrees to be bound by the Agreement and Declaration of Trust. Contributions to the Fund shall be made by the 20th of the month following the month in which the work was performed.

**SECTION 2.** Each employer agrees to pay into the Painters & Allied Trades Local Union No. 195 Health & Welfare Fund the contribution rate set forth above. Contributions shall commence with the employee's first day of employment and shall be made on behalf of all employees working under the terms and conditions of this Working Agreement.

**SECTION 3.** If at any time the Fund is not fully funded, any negotiated increases will be allocated to the Fund to insure that it is fully funded. If the Fund is not fully funded and no new increases are negotiated, the basic hourly wage rate would be reduced and the money allotted to the Fund to insure it is fully funded. The actuary will make final judgment as to whether the Fund is fully funded.

## TRADE RULES AND WORKING CONDITIONS

**SECTION 1.**  Neither the Union nor the Employer shall discriminate against any employee or applicant because of race, color, creed, sex, national origin, or union or non-union status.

**SECTION 2.**  Each journeyperson and apprentice of the Painting Trades shall be required to furnish at least the following tools of the trade:  wall knives, white overalls, putty knives, duster, hammer, screwdriver, pot hooks, work shoes, and steel toed work shoes if required by job site safety program.  Paperhangers and Tapers shall likewise be required to provide such tools of the trade.

**SECTION 3.**  It is agreed that the Employer shall not layoff or discharge an employee because of any Union activity or because of any complaints to the Union against the Employer.

**SECTION 4.**  The Union will not allow any member to contract work that would normally be done by contractors signatory to the District Council 11 Working Agreement at any time.

**SECTION 5.**  All workers shall be allowed five (5) minutes wash-up before Lunch and quitting time and furnished with clean water, soap, and towels; also, fresh drinking water in sanitary water container with paper cups.  Spray persons and helpers shall be allowed reasonable time for personal clean-up.

**SECTION 6.**  No employee shall be penalized or disciplined in any way for his refusal to work with Red Label/epoxy products.

**SECTION 7.**  Any employee working with stilts shall adhere to all appropriate and applicable OSHA guidelines pertaining to safety.  Job site must remain safe and clutter free at all times while wearing stilts.

**SECTION 8.**  No employee shall be penalized or disciplined in any way for refusal to wear stilts.

**SECTION 9.**  Where feasible, the Employer agrees to provide a dressing room for all employees' use in storing street clothes and tools.  Same to be provided with lock and key to be in the charge of Foreman and/or Job Steward.

**SECTION 10.**  The Employer agrees to furnish adequate and safe scaffolding, ladders, and other equipment necessary for the proper performance of the work.

**SECTION 11.**  Employees shall not be transported or transferred of their own accord from job to job during lunch period.

**SECTION 12.**  The Employer shall deliver all materials and equipment to the job.  No employees shall be made to transport bulky or heavy materials or equipment in his car.

# ADDENDUM III

# RHODE ISLAND PAINTERS, PAPERHANGERS & TAPERS

## APPENDIX A
### Paper Hangers Piece Work

A.    Fifty Four Inch Wide Goods (54")

| *EFFECTIVE DATE* | | 6/1/2005 | 6/1/2006 | 6/1/2007 | 6/1/2008 |
|---|---|---|---|---|---|
| 1. | Vinyl | $5.65 | $5.90 | $6.15 | $6.40 |
| 2. | Non Vinyl | $6.15 | $6.40 | $6.65 | $6.90 |

B.    Thirty Six Inch Wide Goods (36") *"all are per square foot prices"*

| *EFFECTIVE DATE* | 6/1/2005 | 6/1/2006 | 6/1/2007 | 6/1/2008 |
|---|---|---|---|---|
| All types and grades | $ 0.60 | $ 0.65 | $ 0.70 | $ 0.75 |

C.    Rolled Goods less than Thirty Six Inches Wide *"all are per single roll prices"*

| *EFFECTIVE DATE* | 6/1/2005 | 6/1/2006 | 6/1/2007 | 6/1/2008 |
|---|---|---|---|---|
| All types and grades | $20.00 | $21.00 | $22.00 | $23.00 |

D.    Borders *"all are per linear foot prices"*

| *EFFECTIVE DATE* | 6/1/2005 | 6/1/2006 | 6/1/2007 | 6/1/2008 |
|---|---|---|---|---|
| All types and grades | $ 0.80 | $ 0.85 | $ 0.90 | $ 0.95 |

# DISTRICT COUNCIL 11

## ACCEPTANCE OF AGREEMENT

Superior
Interiors
RECEIVED
OCT 3 1 2005
G.S.T.

This Agreement shall be effective from *June 1, 2005* to *May 31, 2009.*

_____
**Dominick J. Cieri, Business Manager**
**DISTRICT COUNCIL 11**

The undersigned, _Frank LaTeano_ , hereby accepts and agrees to be bound by the foregoing Agreement as an Agreement between myself and/or the Company for which I am duly authorized to act, and the Union, covering the employment of employees represented by the Union. In consideration thereof, the Union agrees to accept me and/or the Company as an employer under the terms of the Agreement.

The undersigned has read and hereby approves and adopts the foregoing Agreement in its entirety.

Company Name: _Superior Interiors_

Business Address: _230 Main St._
_East Windsor, CT 06088_

Telephone No.:_____ Fax No.:_____

Email Address:_____

Date: _9/13/05_

Printed Name of
Authorized Representative: _Frank J. LaTeano_

Title: _Vice President_

Signature: _Frank J LaTeano VP_

28

08/30/2005  10:04   18608289320               IUPAT DC11                              PAGE  02

# RECOGNITION AGREEMENT

Superior Interiors (the "Employer") hereby recognizes IUPAT District Council 11 (the "Union") as the sole and exclusive bargaining agent, within the meaning of Section 9(a) of the National Labor Relations Act (the "Act"), of all employees of the Employer covered by the attached Collective Bargaining Agreement. Such recognition is predicated on the Union's demand for such recognition pursuant to Section 9(a) of the Act, and on the Union's presentation of a clear showing that the majority of employees in the bargaining unit are members of the Union and desire the Union to act as their exclusive representative within the meaning of Section 9(a) of the Act. The Employer acknowledges that it has reviewed the Union's showing and agrees that it reflects the employees' desire to be represented by the Union under Section 9(a) of the Act.

**EMPLOYER**                                    **UNION**

*District Council 11 2005*
*Recognition Agreement 8-1-05*



**International Painters and Allied Trades Industry Pension Fund**

OFFICE OF GARY J. MEYERS, FUND ADMINISTRATOR    202 I 783 I 4884    FAX 202 I 393 I 6475
UNITED UNIONS BUILDING · 1750 NEW YORK AVENUE, N.W. · SUITE 501 · WASHINGTON, DC 20006-5301

April 18, 2006

Mr. Frank LaTeano                      Code: S-3333
Superior Interiors inc.                LU #: DC0011
230 Main Street
East Windsor, CT 06088

Dear Mr. LaTeano:

Your company, Superior Interiors inc. (hereinafter "the Company"), is delinquent in contributions to the International Painters and Allied Trades Industry Pension Fund (hereinafter "the Fund") in principal of $78,644.50, and $393.22 for interest due for March 15, 2006, $395.19 for interest due for April 15, 2006 and $198.59 for interest due through April 30, 2006 for a total of $987.00 of amortized interest assessed through May 1, 2006 for the period of July and August 2005, for a total of $79,631.50.

Solely in consideration of the fact that if the Company is required to pay the full delinquency immediately it would endanger the financial stability of the Company, and hence the livelihood and pension credits and benefits of the participating employees, the Trustees of the Fund have agreed to permit you to follow the time payment plan outlined in this Promissory Note.

1.  The total principal amount as set forth above, and interest accruing, amortized at six (6%) percent per annum, must be paid in full no later than October 15, 2007.

2.  The principal and interest shall be paid at the rate of $4,637.08 **(to be overnighted)** per month, for 18 months, payable with each current remittance report submitted hereafter, or in any month in which a remittance report is not submitted, by the 15th of that month, until the entire debt has been paid.

3.  The attached worksheet, marked Exhibit A, and incorporated herein by reference as though fully written herein, sets forth the total principal debt including interest, the required monthly payments, and their respective due dates. The Company agrees that Exhibit A represents the correct amounts owed this Fund.

4.  The Company agrees that current remittance reports for all Union jurisdictions will be filed and contributions paid in the manner and within the time required by the Trustees of this Fund. If any further delinquency occurs from this date forward, either as to the debt previously incurred, or as to current payments, such delinquency will be deemed a breach of this agreement and the entire debt, including any amounts conditionally waived, will be due immediately. In that event, appropriate action may be immediately undertaken by the Trustees of the Fund or the Local Union or District Council involved, in accordance with the terms of the applicable Collective Bargaining Agreement and with the Agreement and Declaration of Trust.



EXHIBIT
3

Superior Interiors inc.
April 18, 2006
Page Two

### Promissory Note

4. For this agreement to take effect and if the Company agrees to these terms, <u>an authorized representative of the Company</u> **must sign the agreement in the presence of a notary and return the original agreement by,** April 28, 2006, **along with one of the following:** (1) a bond in the amount of the note, with the Pension Fund as the sole payee, (2) Assignment of Claims on a current job project, and proof of the assignment, (3) a <u>**signed**</u> personal guarantee, or (4) an irrevocable letter of credit from your bank.

5. The first installment of $4,637.08 must reach the Fund Office no later than, May 1, 2006 along with the current reports and contributions as defined on "Exhibit A."

6. Although the Fund Administrator, Gary J. Meyers, has signed this Promissory Note, the Company understands the terms of the Note are ineffective unless each item referenced in paragraph five is provided to the Fund Office.

Sincerely,

*Gary J. Meyers*

Fund Administrator

The undersigned warrants and represents that he or she is a duly authorized representative of the Company, with full authority to bind the Company to this agreement. The undersigned and the Company agree that the foregoing constitutes a binding agreement between the Fund and the Company.

Signature: _____*Frank J. LaZeano*_____
Authorized Representative

Printed Name of Authorized Representative: _*Frank LaZeano*_

Title: _*Vice President*_

S.S.#: _*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*_

Company Name: _*Superior Interiors Inc.*_

Sworn and subscribed to before me on this _*April 25*_ day of, 200 _*6*_ .

*Nadeen S. Clapman*
NOTARY PUBLIC

My commission expires _*October 31, 2008.*_

2824

Superior Interiors inc.
April 18, 2006
Page Three

## PERSONAL GUARANTEE
### Promissory Note

I, _Frank LaTeano_ , have read and understand the foregoing agreement. In consideration of the consent by the Fund to the agreement, I personally guarantee the payments that the Company has agreed to make, and agree as follows:

1.    If the Company fails to comply with the agreement at any time, I will pay all contributions, delinquencies, and amounts specified in the agreement, that the Company owes to the Fund, within ten (10) days after receipt of a written demand for payment by the Fund. Delivery by first class mail to the following address shall be conclusive proof, though not the only means of proving my receipt of a written demand:

The address to which notice should be sent:

_P O Box 568_
_230 Main St_
_East Windsor CT 06088_

2.    The Fund may demand payment from me at any time after a failure of compliance by the Company with this agreement, and I waive any defense of un-timeliness or dilatoriness against a demand for payment by the Fund.

3.    If I fail to pay on the terms set out here, I shall be liable under the same terms, and to the same extent, as the Company and my liability shall include the contractual and statutory liabilities of the Company.

Signature: _Frank LaTeano_

Printed Name of Personal Guarantor: _Frank LaTeano_

Home Address of Personal Guarantor: _28 Concord Rd_
_Manchester CT 06040_

Home Telephone Number of Personal Guarantor: _860-644-2268_

Cell Phone # and Fax # of Personal Guarantor: _860-883-5378_

Relationship of Personal Guarantor to the Company: _Vice President_

Social Security Number of Personal Guarantor: _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_

Sworn and subscribed to before me on this _24th_ day of _April_, 200_6_.

_Nadu S. Chopro_
NOTARY PUBLIC

My commission expires _October 31, 2008_.

28504

Superior Interiors inc.
April 18, 2006
Page Four

# EXHIBIT A
## PROMISSORY NOTE

**NOTE:**    *All installment payments and remittance reports and contributions under this Promissory Note Agreement must be __overnighted__ directly to:*

IUPAT INDUSTRY PENSION FUND
1750 NEW YORK AVENUE, N.W., SUITE 501
WASHINGTON, DC  20006-5301

| Payment # | Amount Due | Current Reports, with Contributions Due | Date Due |
|---|---|---|---|
| *1. | $4,637.08 | | May 1, 2006 |
| | | April 2006 | May 15, 2006 |
| 2. | $4,637.08 | May 2006 | June 15, 2006 |
| 3. | $4,637.08 | June 2006 | July 15, 2006 |
| 4. | $4,637.08 | July 2006 | August 15, 2006 |
| 5. | $4,637.08 | August 2006 | September 15, 2006 |
| 6. | $4,637.08 | September 2006 | October 15, 2006 |
| 7. | $4,637.08 | October 2006 | November 15, 2006 |
| 8. | $4,637.08 | November 2006 | December 15, 2006 |
| 9. | $4,637.08 | December 2006 | January 15, 2007 |
| 10. | $4,637.08 | January 2007 | February 15, 2007 |
| 11. | $4,637.08 | February 2007 | March 15, 2007 |
| 12. | $4,637.08 | March 2007 | April 15, 2007 |
| 13. | $4,637.08 | April 2007 | May 15, 2007 |
| 14. | $4,637.08 | May 2007 | June 15, 2007 |
| 15. | $4,637.08 | June 2007 | July 15, 2007 |
| 16. | $4,637.08 | July 2007 | August 15, 2007 |
| 17. | $4,637.08 | August 2007 | September 15, 2007 |
| 18. | $4,637.08 | September 2007 | October 15, 2007 |

**\* In addition, you will submit the April 2006 reports and contributions by May 15, 2006.**



**International Painters and Allied Trades Industry Pension Fund**

OFFICE OF GARY J. MEYERS, FUND ADMINISTRATOR    202 | 783 | 4884    FAX 202 | 393 | 6475
UNITED UNIONS BUILDING • 1750 NEW YORK AVENUE, N.W. • SUITE 501 • WASHINGTON, DC  20006-5301

September 20, 2005

Ms. Francine LaTeano                            Code: S-3333
Superior Interiors Inc.                         LU #: DC0011
230 Main Street
East Windsor, CT  06088

Dear Ms. LaTeano:

Your company, Superior Interiors Inc. (hereinafter "the Company"), is delinquent in contributions to the International Painters and Allied Trades Industry Pension Fund (hereinafter "the Fund") in principal of $131,916.99, and $1,244.65 in interest assessed through October 15, 2005 for the period of June 2005 through August 2005, for a total of $133,161.64.

Solely in consideration of the fact that if the Company is required to pay the full delinquency immediately it would endanger the financial stability of the Company, and hence the livelihood and pension credits and benefits of the participating employees, the Trustees of the Fund have agreed to permit you to follow the time payment plan outlined in this Promissory Note.

1. . .   The total principal amount as set forth above, and interest accruing, amortized at six (6%) percent per annum, must be paid in full no later than September 15, 2006.

2.       The principal and interest shall be paid at the rate of $11,460.75 **(to be overnighted)** per month, for 12 months, payable with each current remittance report submitted hereafter, or in any month in which a remittance report is not submitted, by the 15th of that month, until the entire debt has been paid.

3.       The attached worksheet, marked Exhibit A, and incorporated herein by reference as though fully written herein, sets forth the total principal debt including interest, the required monthly payments, and their respective due dates.  The Company agrees that Exhibit A represents the correct amounts owed this Fund.

4.   The Company agrees that current remittance reports for all Union jurisdictions will be filed and contributions paid in the manner and within the time required by the Trustees of this Fund.  If any further delinquency occurs from this date forward, either as to the debt previously incurred, or as to current payments, such delinquency will be deemed a breach of this agreement and the entire debt, including any amounts conditionally waived, will be due immediately.  In that event, appropriate action may be immediately undertaken by the Trustees of the Fund or the Local Union or District Council involved, in accordance with the terms of the applicable Collective Bargaining Agreement and with the Agreement and Declaration of Trust.



EXHIBIT

Superior Interiors Inc.
September 20, 2005
Page Two

### Promissory Note

4. For this agreement to take effect and if the Company agrees to these terms, <u>an authorized representative of the Company</u> **must sign the agreement in the presence of a notary and return the original agreement by,** September 30, 2005, **along with one of the following:** (1) a bond in the amount of the note, with the Pension Fund as the sole payee, (2) Assignment of Claims on a current job project, and proof of the assignment, (3) a **signed** personal guarantee, or (4) an irrevocable letter of credit from your bank.

5. The first installment of $11,460.75 must reach the Fund Office no later than, October 15, 2005 along with the current reports and contributions as defined on "Exhibit A."

6. Although the Fund Administrator, Gary J. Meyers, has signed this Promissory Note, the Company understands the terms of the Note are ineffective unless each item referenced in paragraph five is provided to the Fund Office.

Sincerely,

*Gary J. Meyers*

Fund Administrator

The undersigned warrants and represents that he or she is a duly authorized representative of the Company, with full authority to bind the Company to this agreement. The undersigned and the Company agree that the foregoing constitutes a binding agreement between the Fund and the Company.

Signature: _____*Frank J. Latrano*_____
                        Authorized Representative

Printed Name of Authorized Representative: *FRANK   J.   LATRANO*

Title: *V.P.*

S.S.#: *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*

Company Name: *Superior Interiors*

Sworn and subscribed to before me on this *28th* _____ day of, 200*5* .

*Daniel Smolin*
NOTARY PUBLIC                                         *September*

My commission expires *11/20/08*

DANIEL SMOLIN
NOTARY PUBLIC
MY COMMISSION EXPIRES NOV. 30, 2008

Superior Interiors Inc.
September 20, 2005
Page Three

## PERSONAL GUARANTEE
### Promissory Note

I, _Frank LaTrano_ , have read and understand the foregoing agreement. In consideration of the consent by the Fund to the agreement, I personally guarantee the payments that the Company has agreed to make, and agree as follows:

     1.    If the Company fails to comply with the agreement at any time, I will pay all contributions, delinquencies, and amounts specified in the agreement, that the Company owes to the Fund, within ten (10) days after receipt of a written demand for payment by the Fund. Delivery by first class mail to the following address shall be conclusive proof, though not the only means of proving my receipt of a written demand:

The address to which notice should be sent:

_28 Concord Rd_

_Manchester, CT  06040_

     2.    The Fund may demand payment from me at any time after a failure of compliance by the Company with this agreement, and I waive any defense of un-timeliness or dilatoriness against a demand for payment by the Fund.

     3.    If I fail to pay on the terms set out here, I shall be liable under the same terms, and to the same extent, as the Company and my liability shall include the contractual and statutory liabilities of the Company.

Signature: _Frank J. LaTrano_

Printed Name of Personal Guarantor: _FRANK J. LATRANO_

Home Address of Personal Guarantor: _28 CONCORD RD._

_MANCHESTER, Ct  06040_

Home Telephone Number of Personal Guarantor: _860-644-2268_

Cell Phone # and Fax # of Personal Guarantor: _860-883-5378 + 860-292-6102_

Relationship of Personal Guarantor to the Company: _V.P_

Social Security Number of Personal Guarantor: _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_

Sworn and subscribed to before me on this _28th_ day of _September_, 2005 .

_Daniel Smolin_
NOTARY PUBLIC

My commission expires _11/30/08_ .

DANIEL SMOLIN
NOTARY PUBLIC
MY COMMISSION EXPIRES NOV 30, 2008

Superior Interiors Inc.
September 20, 2005
Page Four

## EXHIBIT A
### PROMISSORY NOTE

*NOTE:*      *All installment payments and remittance reports and contributions under this*
*Promissory Note Agreement must be* <u>*overnighted*</u> *directly to:*

IUPAT INDUSTRY PENSION FUND
1750 NEW YORK AVENUE, N.W., SUITE 501
WASHINGTON, DC 20006-5301

| Payment # | Amount Due | Current Reports, with Contributions Due | Date Due |
|-----------|------------|-----------------------------------------|----------|
| 1. | $11,460.75 | September 2005 | *October 15, 2005 |
| 2. | $11,460.75 | October 2005 | November 15, 2005 |
| 3. | $11,460.75 | November 2005 | December 15, 2005 |
| 4. | $11,460.75 | December 2005 | January 15, 2006 |
| 5. | $11,460.75 | January 2006 | February 15, 2006 |
| 6. | $11,460.75 | February 2006 | March 15, 2006 |
| 7. | $11,460.75 | March 2006 | April 15, 2006 |
| 8. | $11,460.75 | April 2006 | May 15, 2006 |
| 9. | $11,460.75 | May 2006 | June 15, 2006 |
| 10. | $11,460.75 | June 2006 | July 15, 2006 |
| 11. | $11,460.75 | July 2006 | August 15, 2006 |
| 12. | $11,460.75 | August 2006 | September 15, 2006 |

It is my understanding that the May 2005 reports and contributions in the amount of
$29,623.40 will be remitted immediately. In addition the following will be submitted along
with the 1st Promissory Note installment payment of $11,460.75, which is due on October
15, 2005:

| | |
|---|---|
| $ 106.26 | late charges |
| $ 934.25 | December 2004 rate increase shortages |
| $ 20.78 | April 2005 report shortages |
| <u>$13,033.21</u> | Audit deficiency |
| $14,094.50 | Total amount due |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. |
| v. | ) | 1:06-cv-2010 (RMC) |
| | ) | |
| SUPERIOR INTERIORS INC., a/k/a Superior Interior, *et al.* | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF SANFORD G. ROSENTHAL**

Sanford G. Rosenthal, Esquire declares and states, the following:

1.      I am a shareholder with the law firm of Jennings Sigmond and presently serve as counsel to the International Painters and Allied Trades Industry Pension Fund ("Pension Fund") in this case. I am submitting this Declaration to document the attorneys' fees and costs which the Pension Fund has incurred in this case through February 13, 2007.

Case Fees

2.      Attached as Exhibit 6 to Plaintiff's Motion for Entry of Judgment by Default, and incorporated herein by reference, is a list showing all work performed by the office of Jennings Sigmond, P.C. and related costs in connection with the preparation of the Complaint and the Motion for Entry of Judgment by Default against Superior Interiors Inc., a/k/a Superior Interior, *et al.* in this action through February 13, 2007. The listing was prepared from contemporaneous attorney time and expenses records and bills, the originals of which are maintained in the regular business records of Jennings Sigmond. Each piece of work is separately coded and the work performed is described. The fees relevant to this case are $3,134.00 and expenses are $557.50 for a total of $3,691.50.

179771-1

EXHIBIT
5

3.    The identity of those performing services related to this matter and normal hourly rates are as follows.

| INITIALS | NAME | TITLE | HOURLY RATE |
|----------|------|-------|-------------|
| SMC | Shanna M. Cramer | Associate | $200.00 |
| EAC | Elizabeth A. Coleman | Associate | $200.00 |
| CTM | Cathy T. Morton | Paralegal | $ 70.00 |

4.    Plaintiffs only seek judgment for fees in the bills, which reflect a special fee schedule with the International Painters and Allied Trades Industry Pension Fund for a uniform $200.00 per hour rate for all lawyers and $70.00 per hour for paralegals and clerks.

Attorney Background and Experience

5.    <u>Sanford G. Rosenthal</u>. Sanford G. Rosenthal is a firm shareholder and co-leader of the ERISA practice and has practiced law for 23 years. He received his undergraduate education at Pennsylvania State University, where he graduated in 1971. He worked as Audit Manager and Office Manager in the administrative team for the Teamsters Health and Welfare and Pension Funds of Philadelphia and Vicinity from 1971 through 1980. Mr. Rosenthal attended the Dickinson School of Law, where he was awarded the Degree of Juris Doctor in 1983. Mr. Rosenthal is a member of the Bar of the Supreme Court of Pennsylvania and the District of Columbia Bar. He is also admitted to practice before the United States Court of Appeals for the Third Circuit and the United States District Courts for the Eastern and Middle Districts of Pennsylvania. His practice concentrates on the representation of multiemployer benefit funds in delinquency litigation and counseling. A sample of his litigation experience is available in 32 published cases that be obtained through a Westlaw search for "AT ("Sanford G. Rosenthal") and Jennings" in the FPENS-CS library.

179771-1

6.    <u>Shanna M. Cramer</u>. Shanna M. Cramer, an associate in the firm, has actively practiced law for three (3) years. She graduated in 1997 from Rutgers University, with honors, with a Bachelors Degree in History, Political Science and Spanish. She received her law degree in 2001 from Rutgers Law School. Ms. Cramer graduated in 2004 from Beasley School of Law-Temple University, with an LL.M in Taxation. Ms. Cramer has been admitted to the Bars of Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania.

7.    <u>Elizabeth A. Coleman.</u>  Elizabeth A. Coleman is an associate. She graduated in 1999 from Muhlenberg College and received her law degree in 2005 from Villanova University School of Law. She served as Associate Editor of Student Work for the Environmental Law Journal.  Her Note, "In re Hoery v United States: Compensating Homeowners For Loss of Property Value Due to Toxic Pollution under The Continuing Tort Doctrine" was published in the Villanova Environmental Law Journal in 2005.  During law school Ms. Coleman served as a judicial intern for the honorable Susan Peikes Gantman of the Pennsylvania Superior Court. Following law school, she served as a judicial law clerk for the Honorable Albert J. Snite, Jr, in the Philadelphia Court of Common Pleas, Criminal Trial Division.  Ms. Coleman has been admitted to the Bars of Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania.

8.    <u>Catherine T. Morton</u>. Catherine T. Morton is a Paralegal in the Jennings Sigmond office. She has been with the office for six (6) years and is experienced in corporate computer database research, electronic filing procedures throughout the country and preparation and documentation of service of complaints and other pleadings for employee benefit collections matters, in addition to other skills.

179771-1

Legal Market Benchmark

     9.     The time and fees charged in this case are reasonable based on prevailing market rates for similar services by lawyers of reasonably comparable skill, experience and reputation in both the Philadelphia and District of Columbia markets.

     10.     My opinion that the time and fees are reasonable is based on a number of factors, including the following.

     (a)     We serve as counsel or co-counsel to over 20 multiemployer employee benefit funds groups.  The firm currently has 17 lawyers, with a dedicated benefits department of seven (7) lawyers plus part-time work by three (3) other lawyers in the labor practice.  The work is specialized and our competition often is large corporate firms with both employee benefits and federal litigation experience.  In my experience, our fees are normally are substantially lower than the charges of larger firms.

     (b)     The flat rate is this case is consistent with market rates in published surveys by Altman Weil, a leading law firm consultant. Specifically, Altman Weil found a median hourly rate in 2005 of $195 for associates in the Middle Atlantic region (encompassing both Philadelphia and the District of Columbia) and a range up to $273 per hour at the 90th percentile. See Associate Hourly Billing Rates (March 10, 2006), reprinted from http://www.altmanweil.com/PracticeSpecialtiesRates/. The median rate for partners (shareholders) in employee benefits litigation was $305 per hour, *id.*, Practice Specialties and Hourly Rates (October 1, 2005),   A $200 rate in 2006 is only a 2.56% increase over the 2005 median for associates only.

     (c)     The fees are consistent with market ranges in a 2004 Ohio bar association survey, downloads.ohiobar.org/conventions/convention2005/session508%20Economics%20of%20Law.

pdf, especially pages 26 and exhibit 27, especially after giving weight to increases from 2004 to 2006 (roughly 5% per year on average in the Ohio survey) and regional differences reflected in Altman Weil data (Ex. A), showing an 8.33% higher rate in median associates' rates in the Middle Atlantic region ($195) over the East North Central region covering Ohio ($180)). The Ohio survey showed median hourly associate rates in the comparable downtown Cleveland, Cincinnati and Columbus areas of $200 - $235 per hour, ranging up to $ $334 - $359 at the 90[th] percentile. See, Exhibit B (excerpt page 26). It also shows that a $70 per hour paralegal rate is less than the median rate for 5 years experience in Ohio, without adjustment for regional differences, Exhibit B (Ex. 27).

    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

                                    Pursuant to 28 U.S.C. § 1746, I declare under
                                    penalty of perjury that the foregoing is true and
                                    correct.

Signed on:  February 15, 2007          s/ Sanford G. Rosenthal_____
                                    SANFORD G. ROSENTHAL, ESQUIRE
                                    (I.D. NO. 478737)
                                    KENT CPREK (I.D. NO. 478231)
                                    The Penn Mutual Towers, 16th Floor
                                    510 Walnut Street, Independence Square
                                    Philadelphia, PA 19106-3683
                                    (215) 351-0611/615
                                    Attorneys for Plaintiff


OF COUNSEL:
ELIZABETH A. COLEMAN
Jennings Sigmond, P.C.
510 Walnut Street, Suite 1600
Philadelphia, PA 19106
(215) 351-0644


179771-1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. |
| v. | ) ) | 1:06-cv-2010 (RMC) |
| SUPERIOR INTERIORS INC., a/k/a Superior Interior, *et al.* | ) ) ) ) | |
| Defendants. | ) | |

**JENNINGS SIGMOND, P.C. February 2007 ATTORNEYS' FEES**

| Date | Attorney | Task | Time |
|---|---|---|---|
| 2/5/2007 | EAC | Preparation of Correspondence to Peggy Gilbert (x2) | 0.2 |
| 2/6/2007 | EAC | Review letter from Gary Meyers to Craig Lennox | 0.1 |
| 2/7/2007 | EAC | Review E-mail and Delinquency Report from Peggy Gilbert | 0.1 |
| 2/8/2007 | EAC | Preparation of Tom Montemore Declaration | 0.3 |
| 2/10/2007 | EAC | Continued Preparation of Tom Montemore Declaration | 0.4 |
| 2/12/2007 | EAC | Review and Revision of Tom Montemore Declaration; Preparation of Correspondence to Peggy Gilbert (x2); Preparation of Correspondence to Tom Montemore (x2); Review of E-mail from Peggy Gilbert (x2); Review of Documents; Preparation of Motion for Default, Memorandum of Law and Proposed Order. | 6.0 |
| 2/13/2007 | EAC | Calculation of Attorneys' Fees and Costs; Review and Revision of Motion for Default and Memorandum of Law; Preparation of Sanford G. Rosenthal Declaration; Review of E-mail from Peggy Gilbert; Preparation of Documents for Filing. | <u>3.0</u> |
| | | TOTAL | 10.1 |

February 2007 Summary
EAC    10.1 Hrs. x $200         = $ 2,020.00
          11/06 – 1/07 Fees & Costs    = <u>$ 1,671.50</u>
                **Grand Total**    = **$ 3,691.50**

179771-1



# Jennings Sigmond, P.C.
## Time And Expense Details

Report ID:   OT2025 - 9697
Thursday, February 08, 2007

Printed By   MHT
Page   1

| Client | Client Reporting Name | Matter | Matter Reporting Name | Billing Timekeeper |
|---|---|---|---|---|
| PTINTF | IUPAT Industry Pension Fund | 28504 | Superior Interiors, Inc. | Sigmond, Richard B. |

Beginning To End

**Unbilled Time**

| Date | Timekeeper | Hours Worked | Hours To Bill | Rate | Amount Task | Activity | Narrative |
|---|---|---|---|---|---|---|---|
| 1/4/2007 | EAC | 0.20 | 0.20 | 200.00 | $40.00 | | Review of Affidavits of Service for Company and Frank Lateano<br>Memo to File |
| 1/22/2007 | EAC | 1.00 | 1.00 | 200.00 | $200.00 | | Preparation of Request to Enter Default 55(a) and Related Documents |
| 1/23/2007 | CTM | 0.20 | 0.20 | 70.00 | $14.00 | | Review of Electronic Court Documents regarding Default Entry |

**Unbilled Time**

| Totals | | 1.40 | 1.40 | | $254.00 | | |

**Unbilled Expenses**

| Date | Amount | Exp Code | Narrative |
|---|---|---|---|
| 1/4/2007 | $145.00 | 7100 | Service Fee |
| 1/4/2007 | $1.61 | COPY | Photocopies |
| 1/22/2007 | $1.26 | COPY | Photocopies |

**Unbilled Expenses**

| Totals | $147.87 |
|---|---|

**Billed Time**

| Date | Timekeeper | Hours Worked | Hours On Bill | Rate | Amount Task | Activity | Narrative |
|---|---|---|---|---|---|---|---|
| 11/16/2006 | SMC | 0.40 | 0.40 | 200.00 | $80.00 | | Review of Documents<br>Open File |
| 11/16/2006 | EAC | 2.30 | 1.50 | 200.00 | $300.00 | | Review of Intake File<br>Preparation of Complaint<br>Preparation of Correspondence to T. Montemore<br>Memo to File |
| 11/17/2006 | SMC | 0.10 | 0.10 | 200.00 | $20.00 | | Review of Documents |
| 11/17/2006 | EAC | 0.60 | 0.60 | 200.00 | $120.00 | | Review of Correspondence from P. Gilbert<br>Review and Revision of Complaint<br>Preparation of Correspondence to F. Crespo |
| 11/20/2006 | EAC | 0.10 | 0.10 | 200.00 | $20.00 | | Preparation of Correspondence to Attorney S. Cramer<br>Review of Correspondence to Vicki McGlone |
| 11/22/2006 | EAC | 0.70 | 0.70 | 200.00 | $140.00 | | Review of Correspondence from Vicki McGlone<br>Review and Revision of Complaint<br>Preparation of Documents for Filing |
| 11/28/2006 | EAC | 0.10 | 0.10 | 200.00 | $20.00 | | Review of Correspondence from P. Gilbert<br>Preparation of Correspondence to P. Gilbert |
| 11/30/2006 | EAC | 0.10 | 0.10 | 200.00 | $20.00 | | Review of Summons and Complaint from Court<br>Memo to File |
| 12/11/2006 | EAC | 0.30 | 0.30 | 200.00 | $60.00 | | Preparation of Memo to Client Regarding Litigation Status Report |

# Jennings Sigmond, P.C.
## Time And Expense Details

Report ID:  OT2025 - 9697
Thursday, February 08, 2007

Beginning To End

**Billed Time**

| Date | Timekeeper | Hours Worked | Hours On Bill | Rate | Amount Task | Activity | Narrative |
|---|---|---|---|---|---|---|---|
| 12/15/2006 | EAC | 0.10 | 0.10 | 200.00 | $20.00 | | Preparation of Correspondence to T. Montemore and P. Gilbert |
| 12/19/2006 | EAC | 0.30 | 0.30 | 200.00 | $60.00 | | Phone Conference with Joe from Legal Errands |
| | | | | | | | Review of File |

**Billed Time**

| | Totals | 5.10 | 4.30 | | $860.00 | | |
|---|---|---|---|---|---|---|---|

**Billed Expenses**

| Date | Amount | Exp Code | Narrative |
|---|---|---|---|
| 11/22/2006 | $350.00 | 7100 | Filing Fee - Complaint |
| 11/24/2006 | $0.21 | COPY | Photocopies |
| 11/24/2006 | $12.11 | COPY | Photocopies |
| 12/1/2006 | $17.01 | COPY | Photocopies |
| 12/1/2006 | $17.34 | PO | Postage Charges |
| 12/1/2006 | $12.96 | SD | Special Delivery |

**Billed Expenses**

| | Totals | $409.63 |
|---|---|---|

| | Hours Worked | Hours To Bill | Fee Amount | Expense Amount | Total Amount |
|---|---|---|---|---|---|
| **Report Totals** | 6.50 | 5.70 | $1,114.00 | $557.50 | $1,671.50 |

*** End Of Report ***